OPINION OF THE COURT
Arthur F. Engoron, J.
The instant motion is granted and the instant cross motion is denied.
Procedural Posture
The complaint sets forth causes of action for deceptive trade practices under the Consumer Protection Law and for public nuisance under the common law.
Plaintiff, the City of New York, now moves, pursuant to Administrative Code of the City of New York § 20-703 (d), CPLR 6301, and CPLR 6311, to enjoin defendants, essentially, and simply put, (a) from advertising, contracting for, and/or allowing the transient occupancy of New York City class A multiple dwellings, or any other buildings as to which transient occupancy is illegal; (b) to remove any such advertising from all Internet websites and other media, whether or not directly controlled or maintained by defendants; and (c) from disposing or modifying the records maintained and used in the management and operation of such properties. The above-named defendants now cross-move, pursuant to CPLR 3211 (a) (7) and the doctrine of selective enforcement, to dismiss.
*224 Plaintiffs Claims
According to plaintiff (Hartzman affirmation ¶ 59), whose factual allegations are exceedingly well-documented and not significantly denied by defendants,
“Defendants operate a multi-tiered business, advertising, booking, operating and maintaining transient accommodations for short-term stays of less than 30-days in as many as 50 or more Class A [i.e., non-transient] multiple dwellings in New York City, as well as in other buildings for which the legally permissible occupancy prohibits transient occupancy.” (See generally Bigolski moving aff.)
The business includes (or at least included) a website (smart-apartments.com), worldwide advertisements, online photographs of apartments, reservation and booking records, and even laundry services for the subject apartments. The advertising touts the short stays, but fails to mention the illegality and fire safety hazards (infra) (Hartzman moving affirmation ¶¶ 86-92), much less the numerous fire safety code violation notices (Hartzman moving affirmation ¶¶ 80-83; see generally Santiago moving aff). According to plaintiff (and not denied by defendants), defendants Smart Apartments and Toshi nominally run the business, and defendant Chan is a principal of them and is “actively engaged” in their management.
Plaintiff claims that defendants’ placement of tourists and other visitors to New York in residential apartments for “transient” stays of less than 30 days is illegal, unsafe, a deceptive business practice, a public nuisance, and annoys the heck out of the non-transient residents of the building. In particular, plaintiff claims that defendants’ business practices are illegal because they violate chapter 225 of the Laws of New York of 2010, codified in Multiple Dwelling Law § 4 (8) (a), New York City Housing Maintenance Code (NYCHMC) (Administrative Code) § 27-2004 (a) (8) (a), and New York City Building Code (NYCBC) (Administrative Code) § BC 310.1.2 (see generally Colgate moving aff); they are unsafe because the transient occupants are denied the fire safety devices and protections, such as fire extinguishers, sprinklers, alarms, evacuation plans, etc., required of transient hotels; they are a deceptive business practice because defendants’ customers are not told that their transient occupancy is illegal and unsafe; they constitute a public nuisance because they are depleting the city’s stock of affordable, long-term housing and create security risks and quality-of-life problems in the subject buildings; and they bother the non- *225 transient residents of the buildings because the transient occupants host loud, late night parties; vomit, dump garbage, and smoke in the hallways; damage the elevators with all those bulky suitcases; and generally do not conduct themselves in the civilized, genteel manner of the locals (see e.g. McGee moving aff ¶¶ 12-13).
Plaintiff claims that defendants are violating (1) chapter 225 of the Laws of New York of 2010, effective May 1, 2011, which amended the Multiple Dwelling Law, NYCHMC, and the NYCBC to provide that stays of less than 30 days in a residential building are illegal (indeed, a misdemeanor under the Multiple Dwelling Law); (2) Administrative Code of City of NY § 28-118.3.1, which prohibits changing the use of a building, such as from long-term to transient use, even in one apartment in a building, without obtaining a building permit and new certificate of occupancy; and (3) Administrative Code of City of NY § 20-700, which prohibits deceptive trade practices, including “[a]ny false ... or misleading . . . statement . . . made in connection with the . . . lease [or] rental... of consumer goods or services . . . which has the capacity, tendency or effect of deceiving or misleading consumers” (§ 20-701 [a]). Pursuant to section 20-701 (c), “[c]onsumer goods [or] services” are those “which are primarily for personal, household or family purposes.” Pursuant to section 20-710 (d), a “[c]onsumer” is a “purchaser or lessee or prospective purchaser or lessee of. . . consumer goods or services” (which seems rather obvious). Pursuant to section 20-703 (d), the Supreme Court may enjoin violations of section 20-700; and, pursuant to section 20-703 (e), that is regardless of whether “consumers are being or were actually injured.” Furthermore, a transient resident is a consumer of consumer goods and/or services. (See 23 Realty Assoc. v Teigman, 213 AD2d 306, 308 [1st Dept 1995] [Consumer Protection Law covers residential leases, which are, “after all, a purchase of services from the landlord (and, by extension, his [sic] agent)].”) Suffice it to say that the provision of transient residential rentals is covered by Administrative Code § 20-700.
Legal and Safe
Whether or not, in our cynical age, most people would consider engaging in illegal activity as a plus, minus, or neutral, they have the right to know whether it is or is not. As plaintiff notes (Hartzman moving affirmation ¶¶ 39, 41-42), courts and commissions have held that a merchant impliedly represents that its products and services are legal (Benik v Hatcher, 358 *226 Md 507, 534, 750 A2d 10, 25 [Ct App Md 2000]), and safe (e.g. Matter of Intl. Harvester Co., 104 FTC 949, 1984 WL 565290, *87, 1984 FTC LEXIS 2, *241-242 [1984]), and if they are not, the merchant has engaged in a deceptive practice (e.g. Federal Trade Commn. v World Media Brokers, 415 F3d 758 [2005] [illegal]; Matter of Figgie Intl., Inc., 107 FTC 313 [1986], affd 817 F2d 102 [4th Cir 1987] [unsafe]). Innkeepers have long, and understandably, been held responsible for the fire safety of their guests (e.g. Friedman v Shindler’s Prairie House, Inc., 224 App Div 232 [3d Dept 1928]), and for compliance with the strict fire safety requirements to which they are subject (Bernucci v Marfre Holding Corp., 171 Misc 997 [Sup Ct, NY County 1939]).
The New York City Fire and Building Codes require transient residences to observe significantly higher fire safety standards than non-transient residences (see generally Jensen moving aff), because, the theory goes (Hartzman moving affirmation ¶ 48), the occupants of the former are less familiar than the latter with their surroundings, with fire evacuation procedures, etc. Whether this is justified, as plaintiff and this court believe, or faintly ridiculous, as defendants argue, it is the law. These higher safety standards include fire extinguishers, sprinklers, alarms, evacuation plans, diagrams, “fire safety directors,” fire brigades, command centers, training, the whole nine yards. Plaintiff cogently argues (Hartzman moving affirmation ¶¶ 53-54) that such procedures and paraphernalia save lives.
Public Nuisances
New York State takes an extremely broad view of what constitutes a public nuisance:
“It consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with the use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons.” (Copart Indus. v Consolidated Edison Co. of N.Y., 41 NY2d 564, 568 [1977] [citations omitted].)
This definition certainly covers placing unwary tourists in firetraps and subjecting them to the possibility of serious injury or death (tragic hotel fires, not to mention garden-variety apartment house conflagrations, are a staple of front-page news). (See generally NYCHMC § 27-2114 [a] [defining “nuisance” to include “(w)hatever is dangerous to human life”]; Administra *227 tive Code §§ 15-227 [a] [“Any building . . . perilous to life . . . in case of fire ... by reason of. . . its use (or) deficiencies in fire alarm, fire extinguishing or fire escape equipment ... is a public nuisance within the meaning of the code and the penal law”]; 28-207.3 [buildings unsafe due to fire safety deficiencies may be declared “public nuisances”].)
Furthermore, municipalities may bring actions to abate public nuisances (City of New York v Smokes-Spirits.Com, Inc., 12 NY3d 616, 626 [2009]), and may be awarded injunctive relief therein (City of Rochester v Premises Located at 10-12 S. Washington St., 180 Misc 2d 17 [Sup Ct, Monroe County 1998]).
Defendants’ Defenses
According to an old legal adage, with many variations, “If the law is against you, pound the facts; if the facts are against you, pound the law; if they both are against you, pound the table.” Here, plaintiff has defendants “dead to rights.” In response to plaintiffs overwhelming avalanche of evidence that defendants’ acts violate the Consumer Protection Law and constitute a public nuisance, defendants have opted to pound the table (they do not claim that they are not doing what plaintiff alleges, and they do no more than quibble with plaintiffs interpretation of the law). Their main contentions (this court has considered all the others and found them unavailing) are (1) that some of their operations are actually legal; (2) that they are changing their ways, “laying the groundwork to be the future leader of the 30-day and over New York City apartment rental business”; (3) that plaintiff is using strong-arm, “Police-State,” “stop-at-nothing” tactics (cross-moving mem of law at 3-4) to “rid” New York City of Smart Apartments; (4) that they are not committing a “public” nuisance; (5) that defendant Robert Chan’s acts are shielded by the corporate veil; (6) that only the Commissioner of Consumer Affairs can bring an action for a violation of the Consumer Protection Law; and (7) that plaintiff is engaged in “selective enforcement,” inasmuch as an enterprise called “Airbnb” (probably denoting “air [travel] bed and breakfast”) operates on a much larger scale and heretofore has not been targeted because New York City Mayor Michael Bloomberg owns 88% of Bloomberg LI] which “is a major financial investor in the venture capital fund Andreessen Horowitz, which, in turn, has an investment of approximately one hundred million dollars in Airbnb,” and that “while Airbnb markets its vast inventory of illegal short term rentals, the Mayor’s Office is using all of its power to try and bully Smart Apartments’ occupants and *228 completely eliminate it as a possible competitor” (cross-moving mem of law at 6).
Contentions One to Three
Contentions one to three are simply irrelevant.
Contention Four
Contention four, that defendants are not committing a public nuisance, is belied by their own formulation of the law (cross-moving mem at 17): “A public nuisance consists of conduct or omissions which . . . endanger . . . the . . . safety or comfort ... of a considerable number of persons at one time.” The “public” element of plaintiffs nuisance cause of action is satisfied by the fire safety hazards to defendants’ customers and the loss of comfort sustained by the non-transient tenants of buildings used by defendants (both groups numbering well into the thousands). Public nuisances should not be able to hide behind private property. Defendants argue (reply affirmation ¶ 41) that a public nuisance is “an unreasonable interference with a right common to the general public.” In this court’s view, the general public has a right not to be sold housing accommodations that are dangerous and illegal. Although defendants harp on the idea that the apartments at issue are “private property” (e.g. reply affirmation ¶¶ 40, 43, 46, 47) they are available, indeed advertised, to the general public, more like hotel rooms than private apartments.
Contention Five
Contention five, that plaintiff cannot pierce the defendants’ (or defendant Smart Apartments,’ as Toshi appears to be out of business) corporate veils, misses the point. As this court sees the matter, plaintiff is not seeking to pierce any corporate veil; rather, it is seeking to hold defendant Chan accountable for his own actions. Corporations can only act through their employees; but that does not mean that any act done in furtherance of the corporation’s business is shielded by the corporate veil, which limits personal financial liability for a corporation’s financial debts. For example, an employee who dumps a corporation’s toxic waste is still liable for violating antipollution laws. To take an extreme example, an employee who murders the principal of a corporation’s competitor, even if only done to further the corporation’s business (and not out of personal animosity), is still guilty of murder. Plaintiff alleges, and Chan does not deny, that he is a principal of Smart Apartments and is “actively engaged” in its management. Thus, he is clearly subject to an injunction aimed at preventing Smart Apartments *229 from violating the law and is not entitled to dismissal of the complaint as against him. (See generally Federal Trade Commn. v World Media Brokers, 415 F3d 758, 764 [7th Cir 2005] [individuals subject to liability for corporate acts that they “had authority to control,” which “may be demonstrated by active participation in the corporate affairs, including assuming duties as a corporate officer”].)
Contention Six
Contention six seems to have been abandoned. In any event, in Collier v Home Plus Assoc., Ltd. (18 Misc 3d 1121[A], 2007 NY Slip Op 52526[U], *6 [Sup Ct, Kings County 2007] [Consumer Protection Law does not create private right of action]), the court stated that “a claim under [the Consumer Protection Law] may only be brought by the Commissioner of Consumer Affairs.” However, as argued by plaintiff (reply affirmation ¶¶ 6-8), this dictum is simply inaccurate; Administrative Code of City of NY § 20-703 (d) expressly authorizes the City to apply for injunctive relief, and the City is the, or at least a, proper plaintiff here.
Contention Seven
No recitation of the doctrine of selective enforcement could compare with the eloquent, authoritative disquisition by Judge Fuchsberg in Matter of 303 W. 42nd St. Corp. v Klein (46 NY2d 686, 693-696 [1979] [landlord of “adult” entertainment establishment entitled to hearing on claim of content-based discrimination in application of fire-safety regulations]), which deserves to be quoted at length here.
“The underlying right asserted by petitioner is to equal protection of the laws as guaranteed by the 14th Amendment and the New York State Constitution (art I, § 11), one of the governing principles of our society. As enunciated more than a century ago in Yick Wo v Hopkins (118 US 356, 373-374), it forbids a public authority from applying or enforcing an admittedly valid law ‘with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances’. We have recognized the principle in cases involving the enforcement of the criminal laws and the administrative regulation of public health, safety and morals. To invoke the right successfully, however, both the ‘unequal hand’ and the ‘evil eye’ requirements must be proven — to wit, there must be not only a showing that the law was not applied to *230 others similarly situated but also that the selective application of the law was deliberately based upon an impermissible standard such as race, religion or some other arbitrary classification.
“In particular, in our State, the claim of unequal protection is treated not as an affirmative defense to criminal prosecution or the imposition of a regulatory sanction but rather as a motion to dismiss or quash the official action. And, in its consideration of the merits of such a claim, as it would on a suppression motion, a court must conduct a hearing if, on the papers before it, a strong showing of selective enforcement, invidiously motivated, appears.
“The theory is that conscious discrimination by public authorities taints the integrity of the legal process to the degree that no court should lend itself to adjudicate the merits of the enforcement action. This, even though the party raising the unequal protection claim may well have been guilty of violating the law. . . .
“The burden of proving a claim of discriminatory enforcement is a weighty one. Common sense and public policy dictate that it be so. The presumption is that the enforcement of laws is undertaken in good faith and without discrimination. Moreover, latitude must be accorded authorities charged with making decisions related to legitimate law enforcement interests, at times permitting them to proceed with an unequal hand. For example, it has been held that, in order to bring an appropriate case to test a new regulation or statute, or because of limited manpower [sic] or other resource inadequacies, or for the purpose of deterring other potential transgressors, certain violators may be selected for prosecution out of the class of all known violators. Such an enforcement strategy may also permissibly be directed at only serious violations or those occurring in a geographic area where the probability or rate of violations is high. The reasoning goes that these instances of legitimate law enforcement should not be hampered by requiring that a hearing be held every time one subject to a regulatory or criminal penalty feels he has been unfairly singled out.
“A mere showing of selective enforcement is, therefore, not enough. As indicated, the disparate impact *231 must be shown as well to have been the product of an ‘evil eye’. When officials acknowledge uneven enforcement against a class that has been selected for some reason apart from effective regulation, an impermissible animus has been shown.
“Ordinarily, however, a strong inference of illicit motive will be all that can be expected because admission of intentional discrimination is likely to be.rare; law enforcement officials are unlikely to avow that their intent was to practice constitutionally proscribed discrimination. Proof of intent nevertheless may appear from a convincing showing of a grossly disproportionate incidence of nonenforcement against others similarly situated in all relevant respects save for that which furnishes the basis of the claimed discrimination. For history teaches that it is by no means to be assumed that motive and disproportionality have to be discrete. The more convincing is the demonstration of the ‘unequal hand’ — the grosser the disparity of enforcement and the greater the similarity between those prosecuted and those not prosecuted — the stronger will be the inference of illicit motive, since conscious discrimination may then stand out as the only reasonable explanation for the pattern of enforcement.
“Nevertheless, as a practical matter, difficulties in obtaining detailed knowledge of unprosecuted violators in order to meet the burden of demonstrating similarity are likely to be great. Therefore, because the importance of the right to be free from impermissible selective enforcement must be of more than theoretical value, the burden of demonstrating a violation, albeit heavy, must not be so heavy as to preclude any realistic opportunity for success. ‘Latitude should be allowed in this complex area of proof.’
“Consequently, the threshold showing needed to make out a colorable claim must mediate between our reluctance to impugn legitimate law enforcement methods and our desire to safeguard constitutional rights. To establish enough of a case to trigger an evidentiary hearing as of right, a petitioner must show, on the strength of sworn affidavits and other proof supplying factual detail, that he is more likely than not to succeed on the merits. In formulating this test we draw rough guidance from the principles *232 governing the issuance of a preliminary injunction, since, in essence, the relief sought in petitioner’s claim will enjoin the authorities from enforcing the commissioner’s order against it. Only the meaningful showing to which we have alluded will enable a court to infer the reasonable probability of success. The interdependence of evidence relating to uneven enforcement and motivation, on which we have already commented, is a factor which, of course, is to be considered when determining whether this standard has been met.” (Citations omitted; emphasis added.)
After careful consideration of the multitudinous facts of this case and the multifarious factors to be considered, this court finds that defendants have not demonstrated entitlement to a hearing on selective enforcement. First, and perhaps foremost, defendants are not actually claiming, and could not plausibly claim, “selective enforcement”; rather, what they are really claiming is selective non-enforcement, that is, as against Airbnb. Selective non-enforcement may raise criminal law or political issues, but this court is not aware of any legal issues it raises. Second, from its origins in Yick Wo v Hopkins (118 US 356 [1986]) to the language in 303 W. 42nd St. Corp., the focus of the selective enforcement doctrine is unlawful, invidious discrimination. Here, defendants have not claimed discrimination based on “race, religion or some other arbitrary classification” (46 NY2d at 693). Nor can this court imagine Mayor Bloomberg, who doubtless has other political, legal, and economic matters on his mind, casting an “evil eye” against one of various competitors in the illegal market for transient occupancies in non-transient buildings because of an indeterminate but attenuated investment (alleged in an unsworn mem of law). Finally, plaintiffs explanation of how defendants were chosen as the test case of the new law (reply affirmation ¶¶ 42-55) is compelling and convincing, and evinces a gimlet eye, not an “evil eye.” Thus, this court does not believe that it is lending itself to a “tainted legal process”; rather, it believes that it is lending itself to a well-thought-out attempt to quash illegal activity.
In sum, defendants have failed to make the “strong showing of selective enforcement, invidiously motivated,” that 303 W. 42nd St. Corp. requires for a hearing to be mandated (aside from the fact that the delay a hearing would entail could jeopardize the lives of transient residents of non-transient buildings) (46 NY2d at 693).
*233 Injunctive Relief
The New York standard for granting a preliminary injunction is well established: a movant must show (1) the likelihood of success on the merits; (2) irreparable injury absent the granting of a preliminary injunction; and (3) a balancing of the equities that favors the movant’s position. (Aetna Ins. Co. v Capasso, 75 NY2d 860, 862 [1990]; W.T. Grant Co. v Srogi, 52 NY2d 496, 517 [1981].) Plaintiff here satisfies this strict general standard; but the standard in this particular case is much looser. “[I]rreparable injury is presumed from the continuing existence of an unremedied public nuisance.” (City of New York v 330 Cont. LLC, 60 AD3d 226, 230 [1st Dept 2009].) In an analogous context, the First Department stated as follows: “A municipality has authority to obtain temporary restraining orders strictly enforcing its zoning ordinances. The three-pronged test for injunctive relief does not apply; no special damage or injury to the public need be alleged; and commission of the prohibited act is sufficient to sustain the injunction.” (City of New York v Bilynn Realty Corp., 118 AD2d 511, 512 [1986] [emphasis added].)
Again, even using the strict general test, placing unsuspecting tourists in illegal, dangerous accommodations constitutes irreparable injury, especially if there is a tragic fire; and the equities lie in favor of shutting down an illegal, unsafe, deceptive business, rather than in allowing said business to continue to operate (to defendants’ presumed financial advantage).
Defendants’ request to have the City post a bond pursuant to CPLR 6312 is denied pursuant to CPLR 2512.
Conclusion and Disposition
For the reasons set forth herein, the cross motion is denied, the motion is granted; and defendants and their employees, agents etc. are hereby preliminarily enjoined (a) from advertising, contracting for, and/or allowing the transient occupancy, i.e., less than 30 days, of New York City class A multiple dwellings, or any other buildings as to which transient occupancy is illegal; (b) from advertising such occupancies on any and all Internet websites and other media, and to remove whatever such advertising currently is on those sites, whether or not directly controlled or maintained by defendants; and (c) from disposing or modifying the records maintained and used to manage and operate such transient use; all until the resolution of this case or further court order.