[8 NYS2d 859]

BROOKFORD, LLC, Plaintiff, v NOELLE PENRAAT, Defendant.

Supreme Court, New York County, December 19, 2014

**APPEARANCES OF COUNSEL**

*Alterman & Boop, LLP*, New York City, for defendant.
*Rosenberg & Estis, P.C.*, New York City, for plaintiff.

**OPINION OF THE COURT**

CAROL ROBINSON EDMEAD, J.

Defendant Noelle Penraat resides in a four-bedroom, rent-controlled duplex apartment on Central Park West[1] (the apartment). Over the past two years,[2] defendant has had 135 short-term rentals, some as short as for three nights, but none exceeding 21 days, facilitated by the use of the website Airbnb (www.Airbnb.com).

---

**1.** The building is located at 315 Central Park West, in Manhattan (building).

**2.** At the court's direction, defendant provided information on her rentals through Airbnb since January 2012.

Defendant's landlord, Brookford, LLC (plaintiff or building owner), now moves by order to show cause for a preliminary injunction enjoining defendant from, inter alia, advertising and renting the apartment to tourists and other visitors for stays of less than 30 days, in violation of New York City Rent and Rehabilitation Law (Administrative Code of City of NY) § 26-408 (a) (1) (Rent Control Law or RCL); 9 NYCRR 2204.2 (a) (1) (regulations implementing the RCL); Multiple Dwelling Law § 4 (8) (a); New York Housing Maintenance Code (Administrative Code of City of NY) § 27-2004 (a) (8) (a) (HMC or Housing Maintenance Code); New York City Building Code (Administrative Code of City of NY, tit 28, ch 7) § BC 310.1.2; and the building certificate of occupancy (COO).[3]

## Factual Background

According to the plaintiff's treasurer, Jacob Haberman, the building contains 43 apartments occupied by long-term residential tenants and their families. The building also contains a preschool, the Twin Parks Montessori School, Park West (the school), on the ground floor, which enrolls approximately 175 children, whose ages range from three months through five years.

The Department of Housing Preservation and Development registration (*see* motion, exhibit B; COO, exhibit C), classifies the apartment as "Class A," and the permissible use is as a residential apartment only. The legal rent-controlled rent for the apartment is $4,477.47 per month, of which defendant is responsible for paying $4,193.28; defendant has a Senior Citizen Rent Increase Exemption (SCRIE), which freezes her rent and exempts her from rent increases (*see* SCRIE owner approval form for the premises, dated June 16, 2014, motion, exhibit D). Plaintiff asserts that a person eligible for SCRIE must, inter alia, rent a rent-controlled or rent-stabilized apartment and have a combined household income that is $50,000 or less.

Plaintiff contends that since at least February of 2012, defendant has been renting three of the four bedrooms on a

---

**3.** Plaintiff also moves to enjoin the defendant from "[o]perating an illegal hotel and/or bed and breakfast out of" the apartment, breaching a "substantial obligation of [her] tenancy" by using the apartment for "impermissible business purposes and/or commercial use" by renting it to "tourists and/or other transient occupants for profit in violation of" these rules and regulations; and providing "unfettered access to, from, and within the Building to tourists and other transient visitors who are not lawful occupants of the Premises and/or Building."

continuous basis to tourists and other transient visitors (collectively, guests) for stays of less than 30 days. Defendant advertises her bedrooms on Airbnb, in which she designates the three bedrooms as: (a) "Lovely Small Bedroom in Huge Apartment" (the small bedroom) (which includes a full size bed); (b) "Sunny Bedroom, Central Park View" (the sunny bedroom) (which includes a queen size bed and two large closets); and (c) "Gorgeous master bed/bath on park" (the master bedroom) (which includes a king size bed and private en suite bath).

According to the advertisements, defendant provides fresh linens and towels, toiletries, a hair-dryer, ironing facilities, kitchen, television, air conditioning, heat, ceiling fan, and Wi-Fi Internet. Guests must check in with defendant at the beginning of their stay at 2:00 p.m. and check out at the end of their stay by 10:00 a.m. Guests are provided with a key to the apartment and unfettered access to, from, and within the building. Defendant also provides guests with: (a) reservation of the subject room and payment by credit card via Airbnb; (b) a confirmation number for the reservation; (c) a map of New York City; (d) a dolly for luggage; (e) magazines; (f) instructions on locking and unlocking the front door of the apartment; and (g) listings of websites for discount Broadway tickets.

In exchange, defendant charges a nightly or weekly rate for lodging as follows: $75 per night or $450 per week for the small bedroom (and $15 per person per night for any additional person); $100 per night or $600 per week for the sunny bedroom (and $25 per additional person per night); and $150 per night or $1,000 per week, for the master bedroom. Each bedroom requires a $200 security deposit. Plaintiff contends that in the past year, defendant has rented the apartment to no less than 110 different guests—complete strangers to both herself and the lawful tenants of the building. Thus, according to plaintiff, when defendant is successful in renting all three rooms on a weekly basis she collects approximately $8,883.33 per month, far in excess of her rent-controlled rent, or approximately $106,599.96 a year. If successful in renting the apartment year round on a nightly basis, defendant's income totals approximately $118,300 a year.

Defendant also has a cancellation policy, in which guests who cancel their reservation more than a week in advance will be penalized 50% of the cost, plus any fees incurred. Guests

who cancel less than a week in advance forfeit their entire deposit.

Plaintiff asserts that it has never given defendant permission to operate a commercial enterprise out of the apartment, and such operation significantly compromises the use, safety, and security of children. Notably, the persons who make up the landlord live in the building and are directly affected by defendant's actions.

On July 21, 2014, plaintiff served defendant with a 30-day notice of termination (the notice of termination) which stated, inter alia, that defendant has violated substantial obligations of her tenancy in that she is operating an illegal hotel and/or bed and breakfast in violation of the aforementioned rules and regulations. The notice of termination requires defendant to vacate the apartment on or before August 31, 2014.

In support of injunctive relief, plaintiff argues that it is likely to succeed on the merits of its claim that defendant has substantially violated the obligations of her tenancy by utilizing her residential apartment for business purposes, and commercializing and profiteering from her operation of an illegal hotel and/or bed and breakfast out of the apartment over a period of years in violation of RCL § 26-408 (a) (1) and 9 NYCRR 2204.2 (a) (1).[4] Plaintiff argues that defendant's use of her apartment undermines the very purpose of these rules, and constitutes a substantial and incurable violation of her obligations as a rent-controlled tenant of the premises. Defendant's guests are not roommates or subletters, but clients who are part of her highly organized and apparently successful hotel business. And, by renting to transient occupants for stays of less than 30 days, defendant's use violates Multiple Dwelling Law § 4 (8) (a), HMC § 27-2004 (a) (8) (a), Building Code § 310.1.2 (group R-2), and the COO for the building.

It is also argued that defendant's actions materially change the character of the residential building and unnecessarily compromise the safety and security of the building's tenants and their children. The building owner's 13 family members, ranging in ages from under 6 years old to over 80 years old (grandchildren, children and grandparents) all live in the building and are faced with the constant threat to their life and safety from the guests. Michael Whitman, the tenant in apart-

---

4. Plaintiff's underlying complaint seeks a declaratory judgment, permanent injunction, and eviction.

ment 3S (directly below defendant's apartment), attests that his family (which includes his wife and two minor children) is "confronted at times with elevators with groups of tourists and transients who are not residents of the building . . . on a constant basis. . . . [T]he [tourists and transients] can be noisy and disturb the otherwise quiet and safe environment within this family Building." (Aff ¶ 3.) Whitman "live[s] in fear for the safety of" his family, "who are forced to interact with a stream of strangers in our Building" (aff ¶ 4). Plaintiff's doorman, Maurice Sedacey, states that the guests would "check-in with [him] at the front door of the Building at or near 2:00 p.m. as they would at any hotel" (aff ¶ 5). He logs their names in order to "track the comings and goings of visitors to the Building" (aff ¶ 5). The doorman attests that defendant "instructed" him to allow the guests, whose stays are "always less than 30 days," "unfettered access to the Building after they check-in and during their stay with Defendant." (Aff ¶¶ 8-9.) Plaintiff argues that the tenants of the building should not be subjected to a steady stream of strangers coming and going throughout the building.

Further, as a class A dwelling, the apartment is not properly equipped with the proper fire safety protections required of hotels in the City of New York, and presents a danger to the public health, safety, and welfare. In July 2010, Multiple Dwelling Law § 4 (8) was amended to prohibit the rental of any unit in class A multiple dwellings for less than 30 days, prevent tenants looking to rent out residential units "from circumventing the strict fire and safety standards applicable to hotels," and to protect the rights of permanent occupants who "must endure the inconvenience of hotel occupancy in their buildings" (*Dexter 345 Inc. v Cuomo*, 663 F3d 59, 62 [2d Cir 2011]). Class A multiple dwellings are not required to and do not meet the strict safety requirements of hotels and, when illegally used as transient hotels, create a safety issue for transients who are likely unaware that they are staying in rooms offered in violation of the law.

Thus, a preliminary injunction is warranted in order to restrain defendant from operating her illegal hotel, by which defendant continuously invites a steady stream of strangers into the building and endangers the lives and safety of both the guests and tenants of the building.

And, plaintiff argues, the balance of the equities weighs in its favor. The only purported injury that defendant may suffer is

the suspension of operation of her illegal hotel and/or bed and breakfast, which can be compensated by money damages. If a preliminary injunction is not granted, plaintiff, the building and its occupants will be subjected to life and safety risks created by defendant's continued use of the building and apartment as a transient hotel.

In opposition, defendant argues that the temporary restraining order is overbroad in that it precludes activities that are legal and permissible and is unwarranted.[5]

There is no likelihood of success on the merits. First, the predicate notice is void, as it is directed at defendant instead of her father, Jacob Penraat, who plaintiff has acknowledged in Division of Housing and Community Renewal (DHCR) filings and monthly bills as the tenant of record. Plaintiff cannot hold an occupant responsible as if the occupant were a tenant while simultaneously asserting that the occupant is not a tenant.

Further, plaintiff failed to serve a notice to cure prior to the 30-day notice of termination in accordance with the lease. Nor has plaintiff specified what particular conduct cannot be cured. Without a notice to cure, there is nothing defendant can do other than abandon her rights and vacate her home. Thus, the action is improperly commenced.

Moreover, the alleged conduct is not illegal under Multiple Dwelling Law § 4 (8) and the Administrative Code, which was amended on July 16, 2010 (the amendment) to make clear that there is nothing illegal about a tenant or other permanent resident renting out a room in the apartment that the individual occupies for payment. The sponsor of the amendment, Senator Liz Krueger, has stated on her website that such conduct is not illegal and does not make the building into a hotel or constitute the operation of a business or commercial venture. And, as the purpose of a class A multiple dwelling is to provide a "residence," there is nothing less "residential" about an occupant living permanently and simultaneously in a unit sharing her unit with another, whether a family member or paying guest through Airbnb. Both the guest and the occupant engage in purely residential activities of sleeping, bathing, eating and sitting to have conversation or read, and engaging in these activities do not make the occupancy equivalent to the operation of a business. And, there are actually fewer people in the

---

**5.** Defendant asserts that she has abided by the court's preliminary injunction and has cancelled future reservations.

apartment on a daily basis than was true when defendant, her partner, their two sons, and her parents all resided there. The short-term nature of a guest's occupancy is no basis to distinguish between a paying guest and a visiting family member. Plaintiff cites no case law indicating that permitting a guest to stay overnight makes the use of the apartment commercial. The term "use," given its ordinary meaning in the absence of any statutory definition, refers to the nature of the activities and whether they are associated with the conduct of some business such as the sale of retail goods or the manufacture or repair of some product. The conclusion that a paying guest does not render the apartment "commercial" or an "illegal hotel" is consistent with the balance of Multiple Dwelling Law §§ 67 (16) (a) and 120 (pertaining to use of dwelling units for other than permanent residence purposes).

To the extent defendant has permitted individuals to stay 30 days or more, such conduct is not covered by any of the laws, rules and/or regulations cited by plaintiff.

Further, other courts have found that the rental of a room in a tenant's own apartment while the tenant is simultaneously occupying the apartment does not violate the law.

And, defendant argues, the definition of class A multiple dwelling in Housing Maintenance Code § 27-2004 (a) (8) (a) as one which "is occupied, as a rule, for permanent residence purposes" does not support plaintiff's argument, since such rule does not require such a dwelling to be occupied "exclusively" for permanent residence purposes. Nor does section 26-408 (a) (3) of the New York City Rent and Rehabilitation Law governing evictions support plaintiff's position, as this section requires an illegal occupancy. Unlike the rent stabilization law which was amended in 2002 to permit a tenant to charge a roommate no more than a proportional share of the rent, no similar regulation exists with regard to a rent control tenant. The legislature has not applied this restriction to rent control tenants, thereby overturning the prior judicially created rule that as long as a tenant was not overcharging, the court would not get involved in the financial arrangements between roommates. Rent control tenants overcharging a roommate by allocating a larger portion of the rent to that roommate is not a viable cause of action.

There is no claim that in the absence of injunctive relief, the ultimate remedy of an injunction and ejectment would be ineffectual.

Plaintiff also fails to show the imminent threat of irreparable harm. Although plaintiff has known about defendant's conduct, there is no claim of actual injury or any incident where the conduct of a guest of defendant caused any damage or danger or annoyance to any person. The moving papers cover a two-year period of which no actual damage or danger is evident. The "list" provided by defendant's doorman is a rewritten document, and plaintiff does not disclose the number of other guests of other tenants; thus the court cannot determine whether there is a constant stream of visitors attributable to defendant who pose a danger on the elevator as claimed. The delay in bringing this action shows the absence of any danger.

And, the balance of the equities favors defendant. Plaintiff's potential financial gain in evicting defendant and re-renting for higher rent does not outweigh defendant's right to occupy her home of nearly 60 years with friends and guests.

A preliminary injunction should not issue because the relief sought is part of the ultimate relief sought in the complaint.

And, defendant has not collected more from room rentals than her monthly rent. Further, no eviction is warranted where an overcharge to a recently acquired roommate was not so greatly above the monthly rent and the violation is unintentional based on the tenant's belief that it has a right to charge a certain amount. There has not been any overcharge, and this issue must be explored during the pendency of this action.

Should the court grant injunctive relief, plaintiff should post a bond in an amount not less than the apartment rent for the three- or four-year period of time this case is anticipated to be pending.

### Discussion

It is uncontested that plaintiff must demonstrate a likelihood of success on the merits of any one of its various claims in order to obtain the relief sought herein (*see 1234 Broadway LLC v West Side SRO Law Project, Goddard Riverside Community Ctr.*, 86 AD3d 18, 23 [1st Dept 2011] ["a preliminary injunction will only be granted when the party seeking such relief demonstrates a likelihood of ultimate success on the merits, irreparable injury if the preliminary injunction is withheld, and a balance of equities tipping in favor of the moving party"]).

As to plaintiff's claim that defendant substantially violated the obligations of her tenancy pursuant to RCL § 26-408 (a) (1)

and 9 NYCRR 2204.2 (a) (1), RCL § 26-408 (a) (1)[6] provides, in relevant part, that

"a. No tenant, so long as he or she continues to pay the rent to which the landlord is entitled, shall be removed from any housing accommodation which is subject to rent control under this chapter by action to evict or to recover possession . . . except on one or more of the following grounds, or unless the landlord has obtained a certificate of eviction pursuant to subdivision b of this section:

"(1) The tenant is violating a substantial obligation of his or her tenancy other than the obligation to surrender possession of such housing accommodation and has failed to cure such violation after written notice by the landlord that the violation cease within ten days, or within the three month period immediately prior to the commencement of the proceeding the tenant has wilfully violated such an obligation inflicting serious and substantial injury to the landlord . . . ."

■ While the record indicates that defendant has ceased all advertisements and rentals since the commencement of this action, the record supports plaintiff's claim that for three months prior to the commencement of this action, defendant wilfully violated a substantial obligation of her tenancy which inflicted serious and substantial injury to the defendant.

Here, it cannot be said that the violation was merely technical or de minimis (see Matter of Park W. Vil. v Lewis, 62 NY2d 431, 437 [1984] ["(I)n addition to requiring proof that a tenant violated a substantial obligation of the lease, . . . a landlord must also demonstrate that the violation of such obligation

---

6. 9 NYCRR 2204.2 (a) (1) is similar in this regard and provides: "(a) Except as provided in sections 2204.1 and 2204.4 of this Part, an action or proceeding to recover possession of any housing accommodation shall be maintainable, after service and filing of the notice by section 2204.3, only upon one or more of the following grounds:

"(1) The tenant is violating a substantial obligation of his tenancy, other than the obligation to surrender possession of such housing accommodation, *and has failed to cure such violation after written notice by the landlord that the violation cease within 10 days*; or within a three-month period immediately prior to the commencement of the proceeding, the tenant has willfully violated such an obligation inflicting *serious and substantial injury* upon the landlord." (Emphasis added.)

was a significant one—i.e., not a technical or a *de minimis* violation"]).

In *Peck v Lodge* (2003 NY Slip Op 30230[U] [Sup Ct, NY County 2003] [trial order]), landlord plaintiff served on Lodge a notice of termination, based upon her alleged profiteering from the use of the apartment "in breach of a substantial obligation of [her] tenancy" by operating a bed and breakfast from the apartment. The landlord then commenced an action for ejectment and sought a preliminary injunction directing tenant to cease renting rooms to transients for a fee.

In addressing the parties' respective motions for summary judgment in their favor, the court granted the landlord's motion for summary judgment as to ejectment. The court held:

> "the evidence produced by plaintiff establishes that Lodge's use of her apartment as a 'bed and breakfast' materially diverges from the character of the residential building, seriously threatens her landlord Peck's $1.5 million worth of shares as well as his leasehold interest in the premises, and significantly disturbs the building's other tenants in the peaceful use of their apartments . . .

> "Lodge insists that her 'guests' were actually 'roommates' such that she is protected by RPL 235-f ('the Roommate Law') and cannot be charged with profiteering. However, this contention is unsupported by any credible evidence. A 'roommate' is a long-term co-occupant of an apartment with the lease-holder, with whom s/he shares the entire living area. . . . All of the evidence in the instant case—except for some self-serving representations by Lodge—indicate that her guests were numerous, short-term, and restricted in their use of the apartment's space. If, as the record indicates, they were also charged sums which in the aggregate exceeded the legal monthly rent, which the landlord himself could not legally charge a sublessee, the subtenant is making a profit or 'profiteering'—that is, she is commercializing the apartment and defrauding her landlord. . . . Here, the evidence shows that Lodge rented two of her rooms at $100 a day apiece over eleven years. When Lodge succeeded in renting both rooms every night, as she wished, she netted $4,500 a month ($6,000 a month, less ODE's 25%)—far in excess of her 2003

rent of $2,753.46 a month." (2003 NY Slip Op 30230[U], *10-11.)

Similarly, in *220 W. 93rd St. LLC v Stavrolakes* (2006 WL 4758817 [Sup Ct, NY County 2006] [trial order], *affd* 33 AD3d 491 [1st Dept 2006], *lv denied* 8 NY3d 813 [2007]), the landlord sought to evict a rent-controlled tenant who occupied a four bedroom, three bathroom apartment. Justice Solomon declared that

> "defendant has violated her obligations as a rent controlled tenant under the New York Rent Control Law and the New York City Rent and Eviction Regulations by commercializing and profiteering from her right to occupy [her] apartment . . . , in the later part of the period January 2001 to date [Apr. 7, 2006], based upon the testimony and exhibits, that such conduct is an incurable violation of her obligations as a rent controlled tenant, that the individuals who resided in the apartment were subtenants, and that the tenancy is terminated." (2006 WL 4758817.)

On appeal, the First Department held: "the occupancy . . . by numerous persons between 2001 and 2005—especially short-term transient students at illegal rents—was in the nature of subletting rather than taking in roommates, and constituted profiteering and commercialization of the premises, an incurable violation of the rent control laws." (33 AD3d at 491.)

In *City of New York v Smart Apts. LLC* (39 Misc 3d 221, 224 [Sup Ct, NY County 2013]), defendants (Smart Apartments and Toshi and "Chan . . . a principal of them") allegedly operated

> "a multi-tiered business, advertising, booking, operating and maintaining transient accommodations for short-term stays of less than 30-days in as many as 50 or more Class A [i.e., non-transient] multiple dwellings in New York City, as well as in other buildings for which the legally permissible occupancy prohibits transient occupancy."

The City sought to enjoin defendants from such activity, arguing that, inter alia,

> "defendants' placement of tourists and other visitors . . . in residential apartments for 'transient' stays of less than 30 days is illegal, unsafe, a deceptive business practice, a public nuisance, and annoys the heck out of the non-transient residents of

the building[;] . . . [is in violation of] Multiple Dwelling Law § 4 (8) (a), New York City Housing Maintenance Code (NYCHMC) (Administrative Code) § 27-2004 (a) (8) (a), and New York City Building Code (NYCBC) (Administrative Code) § BC 310.1.2; . . . [and is] unsafe because the transient occupants are denied the fire safety devices and protections, such as fire extinguishers, sprinklers, alarms, evacuation plans, etc., required of transient hotels" (*id.*).

Justice Engoron granted plaintiff's motion for an injunction and held:

"Again, even using the strict general test [for granting a preliminary injunction], placing unsuspecting tourists in illegal, dangerous accommodations constitutes irreparable injury, especially if there is a tragic fire; and the equities lie in favor of shutting down an illegal, unsafe, deceptive business, rather than in allowing said business to continue to operate (to defendants' presumed financial advantage)." (*Id.* at 233.)

Here, defendant advertises to tourists and other visitors to book rooms in her apartment, a class A dwelling unit, for stays of less than 30 days. The record supports plaintiff's claims that defendant's rentals are in direct violation of the COO and are unsafe inasmuch as they are unaccompanied by any of the fire and safety protections applicable to short-term rentals of less than 30 days.

Defendant provides all of the items commonly provided by a typical hotel, and other useful amenities to facilitate a visitor or tourist's stay in New York City: fresh linens and towels, complimentary soap, shampoo, a hair dryer, an iron, a dolly, Wi-Fi, and a map and information on local entertainment venues. Similar to a hotel, defendant charges her guests either a nightly or weekly rate, and a fee for additional persons staying in a room; maintains rules for check-in and check-out procedures; requires guests to make a reservation; and provides guests with a reservation number. None of these characteristics are attendant with the typical "roommate" living agreement or arrangement.

Further, based on defendant's own records, of the 135 rentals, not one exceeded 21 days; all of the rentals ranged from at least 3-night stays to one 21-day stay; none of the guests occupied the apartment more than 30 days.

And, plaintiff demonstrated, at this juncture, that defendant has received more than the legal rent for the apartment.

Her current rent is $4,477.47 (complaint ¶ 87). However, based on her online advertisements on Airbnb, from the three-month period of July 1, 2014 through September 30, 2014 alone, defendant generated approximately $21,000 in rental fees, with rental income of approximately $6,400, $6,500, and $8,800 per month, at an average of more than $7,200 per month. For the previous six-month period of January 1, 2014 through June 30, 2014, defendant generated more than $40,000, with rental income ranging from $4,865 per month to as much as $9,919, and thus averaging more than $6,500 per month. In essence, defendant's own records indicate that she has been profiteering from a rent-controlled apartment partially subsidized by another government program, SCRIE.

Therefore, plaintiff has sufficiently demonstrated, at this juncture, that defendant's 135 rentals to transients for the past year and a half for more than the legal regulated rent constitutes an incurable violation of the Rent Control Law (*see Matter of 151-155 Atl. Ave. v Pendry*, 308 AD2d 543, 543-544 [2d Dept 2003] [the "integrity of the rent stabilization scheme is obviously undermined if tenants, who themselves are the beneficiaries of regulated rentals, are free to sublease their apartments at market levels and thereby collect the profits which are denied the main landlord . . . The conduct of a profiteering rent-stabilized tenant is not to be condoned by permitting the tenant to remain after the fraud has been found out" (internal quotation marks omitted)]; *cf. Gold St. Props., L.P. v Freeman*, NYLJ 1202661511936, *1, *4 [index No. 90185/2013, Civ Ct, NY County, June 16, 2014] [deeming the nature of the respondent's guests who rented to travelers via Airbnb on a short-term basis for a fee, per night, as subtenants, not roommates; noting that "limitations on a tenant's ability to cure a sublease only apply to the extent that such a sublease undermines various rent regulatory schemes," and that the premises was not subject to rent regulation]).

As to plaintiff's claim under Multiple Dwelling Law § 4 (8) (a), as amended in 2010, and made effective on May 1, 2011, this section provides as follows:

> "A 'class A' multiple dwelling is a multiple dwelling that is occupied for permanent residence purposes. This class shall include tenements, . . . apartment houses, apartment hotels, . . . duplex apartments,

. . . and all other multiple dwellings except class B multiple dwellings. A class A multiple dwelling shall only be used for permanent residence purposes. For the purposes of this definition, 'permanent residence purposes' shall consist of occupancy of a dwelling unit by the same natural person or family for thirty consecutive days or more and a person or family so occupying a dwelling unit shall be referred to herein as the permanent occupants of such dwelling unit. The following uses of a dwelling unit by the permanent occupants thereof shall not be deemed to be inconsistent with the occupancy of such dwelling unit *for permanent residence purposes*:

"(1)(A) occupancy of such dwelling unit for fewer than thirty consecutive days by other natural persons living within the household of the permanent occupant such as house guests or lawful boarders, roomers or lodgers; or

"(B) incidental and occasional occupancy of such dwelling unit for fewer than thirty consecutive days by other natural persons when the permanent occupants are temporarily absent for personal reasons such as vacation or medical treatment, provided that there is no monetary compensation paid to the permanent occupants for such occupancy." (Emphasis added.)

According to plaintiff, the amendment of Multiple Dwelling Law § 4 (8) was intended to prevent both building owners *and tenants*, such as defendant, looking to rent out units from circumventing fire and safety laws applicable to hotels. According to defendant, on the other hand, the intent of the amendment is to establish that a permanent resident's fee-based rental of a room in his or her apartment that he or she occupies is neither illegal nor converts such building into a hotel.

First, the court observes that prior to its amendment, Multiple Dwelling Law § 4 (8) (a) defined "class A" multiple dwelling simply as one that was "occupied, *as a rule*, for permanent residence purposes." (Emphasis added.) The section then elaborated that "[t]his class shall include tenements, . . . apartment houses, apartment hotels, . . . studio apartments, duplex apartments, . . . and all other multiple dwellings

except class B multiple dwellings."[7] "Class B multiple dwellings are 'occupied, as a rule transiently, as the more or less temporary abode of individuals or families" and include hotels, lodging houses, rooming houses, and lodgings (*Dexter 345 Inc. v Cuomo*, 663 F3d 59, 61 [2d Cir 2011], citing Multiple Dwelling Law § 4 [9]). "Class B dwelling units were required to comply with more stringent egress and fire safety requirements" (*id.* at 62).

Thus, by clarifying, by amendment in 2011, that a class A multiple dwelling "*shall only*" be used for permanent residence purposes," and defining such permanent residence as an occupancy by "the same" person or family for at least 30 consecutive days, the legislature intended to limit a class A multiple dwelling unit to one that is occupied by the same person or family for at least 30 days *solely*.

However, at the same time, the amendment created two types of occupancies that would not deprive the multiple dwelling from its "permanent residency" class A status: (a) an occupancy for fewer than 30 consecutive days by other natural

---

7. The definition of "multiple dwelling" under HMC § 27-2004 (a) (8) (a), on which plaintiff also relies, mirrors the former language of Multiple Dwelling Law § 4 (8), and provides that "[a] class A multiple dwelling is a multiple dwelling that is *occupied, as a rule*, for permanent residence purposes. This class shall include . . . apartment houses, apartment hotels, . . . duplex apartments, . . . and all other multiple dwellings except class B multiple dwellings."

Further, it is uncontested that Building Code § BC 310.1.2, on which plaintiff relies, defines the occupancy of Group R-2 as follows:

"Group R-2.
"This occupancy shall include buildings or portions thereof containing sleeping units or more than two dwelling units *that are occupied, as a rule*, for shelter and sleeping accommodation on a long-term basis for a month or more at a time. Such occupancy shall be subject to New York State Multiple Dwelling Law. This group shall include, but not be limited to, the following . . . .
"Apartment Houses . . . .
"Class A multiple dwellings as defined in Section 27-2004 of the New York City Housing Maintenance Code and Section 4 of the New York State Multiple Dwelling Law . . . ." (Emphasis added.)

HMC § 27-2004 (a) (8) (a) and Building Code § BC 310.1.2 were subsequently amended.

The term "as a rule" has been interpreted "to mean that owners of Class A buildings could rent up to half of their rooms for 'nonpermanent or transient occupancy,' so long as the majority of the rooms were rented for longer than 30 days" (*Dexter 345 Inc. v Cuomo*, 663 F3d 59 [2d Cir 2011]).

persons living *within the household* of the permanent occupant; and (b) for incidental and occasional occupancy of the unit for fewer than 30 consecutive days by other natural persons when the permanent occupant is temporarily absent provided that the permanent occupant receives no monetary compensation.[8] What the statute does not *expressly* address is the situation herein, where the transient occupies the unit for less than 30 days within the household of the permanent occupant and *there is* "monetary compensation paid to the permanent occupants for such occupancy," a phrase not appearing in Multiple Dwelling Law § 4 (8) (a) (1) (A).

A reading of the memorandum in support by the bill's sponsor, Senator Liz Krueger, reveals that the purpose of the amendment was to prevent *"owners* of class A multiple dwellings" (emphasis added) from "illegally using Class A dwelling units as transient hotels" as class A dwelling units are not required to comply with local building, fire and housing maintenance codes applicable to transient use contemplated by hotels.

The memorandum then elaborates the "[j]ustification" for the amendment as follows:

> "The Multiple Dwelling Law and local Building, Fire and Housing Maintenance Codes establish stricter fire safety standards for dwellings such as hotels that rent rooms on a day to day (transient)

---

8. The memorandum in support explains:
   "Some owners of class A multiple dwellings have been illegally using Class A dwelling units as transient hotels. When called upon to justify this fundamentally unsafe and illegal practice, they have cited the ambiguity of the terms 'as a rule' and 'primarily' preceding the requirement of 'permanent residence' or 'long term' residence for such dwellings. These owners have also claimed that the permanent or long term residence requirement is met when the dwelling unit is leased by a corporate entity for more than 30 days even though the actual occupancy by individuals is less than 30 days. This bill would put an end to these spurious defenses by defining the term 'permanent residence purposes' as occupancy by a natural person or family for 30 consecutive days or longer (the permanent occupants). Only the permanent occupants would be permitted to allow occupancy of the dwelling unit for less than 30 consecutive days and even then only by lawful boarders, roomers or lodgers or house guests living within the household of the permanent occupants or while the permanent occupants are temporarily absent for vacation or other personal reason if there is no monetary compensation for such use." (Senate Introducer Mem in Support, Bill Jacket, L 2010, ch 225 at 9.)

basis than the standards for dwellings intended for month to month (permanent) residence. There are substantial penalties for *owners* who use dwellings constructed for permanent occupancy (Class A) as illegal hotels. However, the economic incentive for this unlawful and dangerous practice has increased, while it is easier than ever to advertise illegal hotel rooms for rent to tourists over the internet . . . In most cases tourists responding to such advertisements are unaware that the rooms are being offered in violation of the law. . . . *It endangers both the legal and illegal occupants of the building because it does not comply with fire and safety codes for transient use.*

". . . In City of New York v. 330 Continental, LLC, 60 AD3d 226, 231 (1[st] Dept. 2009) the court held that the Multiple Dwelling Law allows a minority of the units in building classified as a Class 'A' Multiple Dwelling to be occupied for non-permanent or transient occupancy. . . . In interpreting Section 4 (8) (a) of the Multiple Dwelling Law, the court held that 'the statute's use of the phrase "as a rule" indicates that *a secondary use of the building, different from the specified primary use, is permitted.*' The court concluded that no violation of the Class A certificate of occupancy would result from use of a minority of the units in one of the buildings for non-permanent or transient occupancy.

". . . This bill will fulfill the original intent of the law, as construed by enforcing agencies, including the New York City Department of Buildings, by modifying the specific provisions of the Multiple Dwelling Law and applicable local codes that have been cited by defendants in enforcement proceedings as authority for the use of Class A dwellings as illegal transient hotels. *The only 'secondary' transient use of class A dwelling units allowed would be use by the permanent occupants natural persons, not corporate entities—for house guests, boarders, roomers or lodgers living within the household of the permanent occupants or for circumstances such as the occasional pet or apartment 'sitter' when the permanent occupants are absent for personal reasons, such as vacation or for medical treatment.*" (Senate Introducer Mem in Support, Bill Jacket, L 2010, ch 225 at 10-11 [emphasis added].)

Interestingly, the reference to " 'secondary' transient use" by permanent occupants permissible by the bill's sponsor does not mention permission to charge a fee from house guests, boarders, roomers or lodgers either living within the household of the permanent occupant or living in the apartment when the permanent occupant is absent for personal reasons.[9]

Based on the plain language of Multiple Dwelling Law § 4 (8), as amended, and the stated purpose thereof, Multiple Dwelling Law § 4 (8) was intended to prohibit building owners of class A multiple dwellings, which are intended for permanent residencies, from renting out dwelling units for less than 30 days or on such a transient basis (*see Gold St. Props., L.P. v Freeman* [stating that the Multiple Dwelling Law and HMC are generally aimed at the conduct of property owners, not tenants]). However, it cannot be said that amendment "created" a loophole, or a right, as defendant suggests, for a permanent occupant to engage in such activity. One of the objectives of the amendment is to address the problematic use "of residential property intended for permanent dwelling as 'illegal hotels' or for other transient uses" that pose a danger to transient occupants due to the class A dwellings' freedom from compliance with fire and safety regulations (*see* Governor's Approval Mem, Bill Jacket, L 2010, ch 225 at 5). The intent of the amendment to Multiple Dwelling Law § 4 (8) was to prevent tenants or building owners looking to rent out residential units "from circumventing the strict fire safety standards applicable to hotels" (*Dexter 345 Inc. v Cuomo*, 663 F3d 59, 62 [2d Cir 2011] [upholding the denial of plaintiffs' motion to enjoin the enforcement of Multiple Dwelling Law § 4 (8)]).

---

**9.** Even support from the DHCR explains that "only . . . permanent residents would be permitted to allow lawful boarders, roomers, lodgers or house guests to live within the household provided there is no monetary compensation for such use." (*See* Mem from Gary R. Connor, Counsel to the Division of Housing and Community Renewal, July 19, 2010, Bill Jacket, L 2010, ch 225 at 19.) It is noted that the City did "not believe the legislation as currently been drafted prohibits" the use "of apartments as bed-and-breakfasts where the permanent occupant hosts paying guests and is present during their stay" but would "support a chapter amendment that clarifies this question" and a "chapter amendment that would provide a more workable path to compliance for Class A Single Room Occupancy (SRO) Hotels" and "include requirements for immediate interim fire safety measures to protect occupants as buildings transition to code." (*See* Letter from the City of New York Office of the Mayor, June 30, 2010, Bill Jacket, L 2010, ch 225 at 28.)

The dangers created by such noncompliance exist irrespective of whether the lessor is the landlord or the permanent occupant. The legislation, as drafted without any reference to requirements that protect the health and safety of transient "renting guests" which the amendment was designed, in part to address, cannot be construed to permit the permanent occupant to participate in conduct that is otherwise forbidden of landlords.[10]

Interestingly, the court notes that transient use of a class A dwelling unit for a fee, with significant strictures concerning health, safety and welfare, has been proposed but not passed in 2013.[11]

---

**10.** The other reasons for the amendment are to "prevent 'unfair competition to legitimate hotels that have made substantial investments to comply' with building codes"; "protect the rights of permanent occupants who 'must endure the inconvenience of hotel occupancy in their buildings' "; and "preserve the supply of affordable permanent housing" (*Dexter 345 Inc. v Cuomo*, 663 F3d 59 [2d Cir 2011], citing Mem in Support of 2010 NY Senate-Assembly Bill S6873-B, A10008).

**11.** One example of five proposed amendments to address the transient use of a multiple dwelling unit in the class A multiple dwelling for compensation is found in 2013 NY Senate Bill S5039 as follows:

"Section 1. Paragraph a of subdivision 8 of section 4 of the multiple dwelling law is amended by adding a new subparagraph 3 to read as follows:

"(3) In a class A multiple dwelling, the use of a short-term rental unit for occupancy of fewer than thirty consecutive days shall not be inconsistent with the occupancy of such multiple dwelling for permanent residence purposes if: . . .

"(C) such dwelling unit provides for an evacuation diagram identifying all means of egress from the short-term rental unit and the building in which it is located. Such evacuation diagram shall be posted in a conspicuous place on the inside entrance door of each short-term rental unit;

"(D) such dwelling unit contains working smoke detectors in accordance with local fire code;

"(E) such dwelling unit has sufficient fire, hazard, and liability insurance to cover those persons using the unit for such occupancy;

"(F) all compensation received for rent, or for hire, for such dwelling unit, shall be subject to all appropriate taxes and fees, including, but not limited to, taxes and fees imposed by sections eleven hundred four, eleven hundred five, eleven hundred seven and eleven hundred nine of the tax law, and section 11-702 of the administrative code of the city of New York; and

"(G) such unit is registered with the city in accordance with the provisions of article seven-D of this chapter, unless it is used as a short-term rental unit less than thirty days per calendar year.

Further, plaintiff's records also demonstrate that defendant's use of her apartment is inconsistent with the COO. According to the COO issued by Department of Buildings, the "Description of Use" of the subject unit is "Apartment[ ]" (unlike the "Administrative Offices" and "Classrooms" uses assigned to the first and second floors, respectively). "An 'apartment' is that part of a multiple dwelling consisting of one or more rooms containing at least one bathroom and arranged *to be occupied by the members of a family*, which room or rooms are separated and set apart from all other rooms within a multiple dwelling." (Multiple Dwelling Law § 4 [15].)

Therefore, plaintiff has also demonstrated a likelihood of success on the merits of its claim that defendant's use violated Multiple Dwelling Law § 4 (8) as well.

Defendant's reliance on plaintiff's failure to serve a notice to cure is unavailing.

"A landlord may generally only bring a proceeding for eviction based upon a claim that a tenant violated a substantial obligation of his or her tenancy after serving a written 10 day Notice to Cure" (*156-158 Second Ave., LLC v Delfino*, 18 Misc 3d 1144[A], 2008 NY Slip Op 50440[U], *3 [Civ Ct, NY County 2008], citing *326-330 E. 35th St. Assoc. v Sofizade*, 191 Misc 2d 329, 330 [App Term, 1st Dept 2002], and Rent Stabilization Code [9 NYCRR] § 2524.3 [a] [RSC]).

However, there

> "are only two possible exceptions to the Notice to Cure requirement. The first exception arises where it is asserted that the tenant has 'willfully violated' a substantial obligation of the tenancy and 'inflicted serious and substantial injury upon the owner within a three month period immediately prior to the commencement of the proceeding" (*156-158 Second Ave., LLC v Delfino*, 2008 NY Slip Op 50440[U], *3, citing RSC § 2524.3 [a]).

Here, this exception is applicable since the notice of termination and petition (complaint ¶¶ 92-93) assert a serious or substantial injury.

"The second exception stems from a line of cases holding that failure to serve a Notice of Cure is not fatal where, based upon the cumulative pattern of a tenant's chronic nonpayment

"(H) Provided further that in non owner-occupied buildings, fifty percent or less of the total units may be registered as short-term rental units." (Underlines omitted.)

of rent, the course of conduct is incapable of any meaningful cure" (*156-158 Second Ave., LLC v Delfino*, 2008 NY Slip Op 50440[U], *3-4, citing *Herald Towers, LLC v Perry*, 2003 NY Slip Op 50564[U] [App Term, 1st Dept 2003], and *Century Apts. Assoc. v Kleinman*, 2002 NY Slip Op 50303[U] [App Term, 1st Dept 2002]). After noting that this exception appeared limited to chronic nonpayment holdovers, Justice Cohen in *156-158 Second Ave., LLC* (2008 NY Slip Op 50440[U], *4) explained that, nonetheless, "certain roommate overcharges are also not susceptible to post-judgment cure and perhaps, in these instances, courts should also dispense with the formality of a 10 day Notice to Cure." Continuing, the court explained that "[i]n determining whether a tenant is entitled to a post-judgment cure, courts have looked to the nature of the overcharge. Where the overcharge is so egregious that it rises to the level of 'commercial exploitation,' a post-judgment cure is unavailable" (*id.*), such as in *West 148 LLC v Yonke* (11 Misc 3d 40 [2006], *lv denied* 2006 NY Slip Op 73839[U] [1st Dept 2006]). In *West*, the tenant rented a portion of the stabilized apartment at double the regulated rent to a series of guests and described the apartment, in both an Internet listing for "Affordable Hotels" and on her business card, as the "Chez Sylvie Bed and Breakfast." The Appellate Term upheld the trial court's determination that the tenant's "commercial exploitation" of her stabilized apartment which resulted in a "lucrative windfall" required her eviction (*West*, 11 Misc 3d at 41).

Here, unlike in *156-158*, where (1) the "roommate" paid a proportionate share for use of two of three bedrooms for at least three months, (2) the overcharge of 17.33% was small; (3) the notice of termination did not allege that respondent profiteered or received a lucrative windfall; and (4) the amount collected from respondent's "one roommate was well shy of the total legal regulated rent for the apartment and respondent did not commercially exploit his apartment by renting rooms as a hotel or bed and breakfast" (2008 NY Slip Op 50440[U], *5), defendant's guests are transient, the plaintiff alleges that defendant received a lucrative windfall, the amount defendant collected was in excess of the legal regulated rent, and defendant exploited her apartment on a "bed and breakfast" Internet website, rendering her conduct akin to that of the respondent in *West*. Thus, where a cure is impossible, the landlord is relieved of his obligation to serve on the tenant the usual 10-day notice to cure (*Peck v Lodge*, 2003 WL 26094731 [defend-

ant "has not 'refunded' the sums that she extracted from her guests over the past eleven years (and) cannot do so, with the result that her profiteering is incapable of being 'cured.' "]). As such, the absence of a predicate notice is not fatal to plaintiff's action as defendant contends.

Equally unavailing is defendant's alternative argument that the apartment "continues to maintain its residential character" consistent with the purpose of a class A multiple dwelling, and is not the "operation of a business" because "the occupant and the guest both engage in the purely residential activities of sleeping, bathing, eating and sitting to have conversation" (*see* affirmation of Arlene F. Boop ¶¶ 29, 30, 33, 34). The apartment loses its "permanent" residential character by hosting transient occupancies for less than 30 days; class A multiple dwellings, unlike hotels, are intended for permanent residence purposes.

Defendant's additional contention that plaintiff cites no case law indicating that permitting a guest to stay overnight makes the use of the apartment commercial mischaracterizes the facts and ignores that fact that defendant's guests are not merely staying overnight, but are staying overnight for a fee. Unlike a typical "sleepover," these guests are not staying over for free. And, defendant's contention that the ordinary meaning of "use," requires consideration of whether the activities at issue herein are associated with the conduct of some business such as the sale of retail goods or the manufacture or repair of some product completely ignores the aspect of commercial hotel business which, for the most part, provides rooms for rent on a short-term, transient basis. To limit "business" to the sale of retail goods or the manufacture or repair of some product is wholly disingenuous.

And, defendant's claim that the definition of a class A multiple dwelling in HMC § 27-2004 (a) (8) (a) is one which "is occupied, as a rule, for permanent residence purposes" does not support plaintiff's argument, as it does not require such a dwelling to be occupied "exclusively" for permanent residence purposes, buttresses the converse position that *the amendment*, which struck "as a rule" from the prior definition, was intended to restrict class A multiple dwellings to be occupied exclusively for permanent residence purposes.

Further, defendant's arguments premised on the effect of case law and statutes applicable to roommate situations are inapplicable to defendant's conduct.

As to whether plaintiff suffered from irreparable injury, case law has already set forth that placing tourists in accommoda-

tions that are not designed or equipped with sufficient fire and safety protections, in and of itself, constitutes irreparable injury, and the equities lie in favor of enjoining such conduct, "rather than in allowing said business to continue to operate (to defendants' presumed financial advantage)" (*City of New York v Smart Apts. LLC*, 39 Misc 3d at 233).

## Conclusion

Therefore, based on the foregoing, it is hereby ordered that the order to show cause by plaintiff Brookford, LLC for a preliminary injunction enjoining defendant from advertising and renting the apartment to tourists and other visitors for stays of less than 30 days, operating an illegal hotel and/or bed and breakfast out of the apartment, breaching a "substantial obligation of her tenancy" by using the apartment for "impermissible business purposes and/or commercial use" by renting it to "tourists and/or other transient occupants for profit in violation of" Rent Control Law § 26-408 (a) (1); 9 NYCRR 2204.2 (a) (1) of the regulations implementing the RCL; Multiple Dwelling Law § 4 (8) (a); Housing Maintenance Code § 27-2004 (a) (8) (a); New York City Building Code § BC 310.1.2; and the building certificate of occupancy, and providing "unfettered access to, from, and within the Building to tourists and other transient visitors who are not lawful occupants of the Premises and/or Building," in violation of such rules and laws, is granted, interimly on the strength of a showing of a likelihood of success on the merits.