■ Trust for the Benefit of Shari Lynn Goldstein, Appellant-Respondent, v Linda Lipetz, Respondent-Appellant. [53 NYS3d 296]—

Order, Supreme Court, New York County (Shlomo Hagler, J.), entered July 27, 2015, which denied plaintiff's motion for summary judgment on its first, second and third causes of action and for dismissal of defendant's affirmative defenses and counterclaim, and denied defendant's cross motion for summary judgment dismissing the complaint, modified, on the law, to grant plaintiff's motion, and to declare that plaintiff validly terminated the lease, and otherwise affirmed, without costs.

The law is clear that a rent-stabilized tenant who sublets her apartment at market rates to realize substantial profits not lawfully available to the landlord, and does so systematically, for a substantial length of time, places herself in jeopardy of having her lease terminated on that ground, with no right to cure (see Gruber v Anastas, 100 AD3d 829 [2d Dept 2012]; 220 W. 93rd St., LLC v Stavrolakes, 33 AD3d 491 [1st Dept 2006], lv denied 8 NY3d 813 [2007]; Matter of 151-155 Atl. Ave. v Pendry, 308 AD2d 543, 543-544 [2d Dept 2003]; BLF Realty Holding Corp. v Kasher, 299 AD2d 87, 91 [1st Dept 2002], lv dismissed 100 NY2d 535 [2003]; Continental Towers Ltd. Partnership v Freuman, 128 Misc 2d 680 [App Term, 1st Dept 1985]). The record before us establishes, as a matter of law, that this is precisely what defendant did with the rent-stabilized cooperative apartment she leased from plaintiff, the trust that holds the unit's appurtenant cooperative shares and its proprietary lease. Accordingly, plaintiff is entitled to summary judgment on its first cause of action (for a declaration that it validly terminated the lease), on its second cause of action (for ejectment), and as to liability on its third cause of action (for recovery of the fair value of the use and occupancy of the apartment since defendant was served with notice of the termination of the lease). We therefore modify the order appealed from to grant plaintiff's motion for such relief.

Defendant does not dispute that she sublet her apartment to 93 different customers recruited through the Airbnb website, for 338 days spread over a period of 18 months (the first stay began on March 1, 2011, and the last began on August 29, 2012), at nightly rates ($95 for one person, $120 for two) far in excess of her stabilized rent, which was $1,758.01 per month

during the relevant period, equivalent to $57.80 per day.[1] Although a tenant is permitted by Rent Stabilization Code (RSC) (9 NYCRR) § 2525.6 (b) to charge a 10% premium for an otherwise lawful sublet of a furnished rent-stabilized apartment, 110% of plaintiff's stabilized rent, on a per-diem basis, was only $63.58. Thus, the $95 per night that she charged single guests was approximately one and a half times the lawful per-diem charge for a sublet, and the $120 she charged couples was nearly twice (approximately 189%) the lawful charge.

The evidence in the record from the Airbnb website reveals that the blatancy of defendant's commercialization of her apartment was comparable to that of tenants who have been evicted for profiteering in prior cases (see *335-7 LLC v Steele*, 53 Misc 3d 150[A], 2016 NY Slip Op 51689[U] [App Term, 1st Dept 2016]; *42nd & 10th Assoc. LLC v Ikezi*, 46 Misc 3d 1219[A], 2015 NY Slip Op 50124[U] [Civ Ct, NY County 2015], *affd* 50 Misc 3d 130[A], 2015 NY Slip Op 51915[U] [App Term, 1st Dept 2015]; *West 148 LLC v Yonke*, 11 Misc 3d 40, 41 [App Term, 1st Dept 2006], *lv denied* 2006 NY Slip Op 73839[U] [1st Dept 2006]; *see also Brookford, LLC v Penraat*, 47 Misc 3d 723, 725 [Sup Ct, NY County 2014] [granting interim injunction against tenant's Airbnb subletting]). Defendant advertised her apartment on the Airbnb website as "5th Avenue Perfection," and described the accommodations as follows: "Large well appointed private bedroom in great downtown location. (Greenwich Village West) Step out onto New York's 5th Ave from posh doorman building located in the best zip code in NYC. Just steps from Washington Sq Park your comfortable room is surprisingly quiet, but then 5th Ave ends at the park just a stones [sic] throw away so traffic is minimal. Flat screen TV[.] Share fully outfitted kitchen and spotless bathroom with 1 other . . . owner (female)[.] Walk a few short blocks to 2 subway stations (West 4th St or 14th St/Union Sq)[.] Perfect for single or couple. Private Entrance . . . Elegent [sic] Comfy[.]"

Defendant's listing on the Airbnb website also provided (1) links for making reservations, (2) "check-in" and "check-out" times, (3) the financial penalty for untimely cancellation, and (4) reviews from numerous past guests.

Turning her rent-stabilized apartment into a single-unit tourist hotel in this fashion enabled defendant to earn substantial

---

**1.** Most of defendant's "guests" stayed for less than a week. Only one of them stayed for more than 11 days.

profits, far in excess of the legally permissible 10% premium.[2] After Airbnb (to which the subtenants paid the rent) deducted its fees, the subletting generated total income of $33,592 for defendant. The stabilized rent she paid for the same 338 days (based on the aforementioned per-diem figure of $57.80) was only $19,536.40. Thus, defendant realized a 72% profit from her subletting—about seven times the 10% premium permitted for otherwise lawful sublets of furnished rent-stabilized apartments. Had defendant limited herself to the 10% premium permitted by the RSC, her aggregate revenue would have been $21,490.04—about $12,000 less than her actual revenue of $33,592. Taking into account the lawful 10% premium (and ignoring the fact that the apartment was shared), defendant overcharged her 93 subtenants, in aggregate, by approximately 56%.[3]

Initially, we are unanimous in rejecting defendant's primary argument on this appeal, in which she contends that the 93

---

**2.** Defendant does not dispute plaintiff's figures, derived from the records provided by Airbnb, for the number of paying guests she hosted, the aggregate number of days her guests stayed in the apartment, the daily rates the guests were charged, and her aggregate revenue from the subletting. Contrary to the dissent's assertion, defendant has not submitted a chart of all of her Airbnb income, only a chart listing her revenue during eight of the 18 months at issue. Neither defendant nor the dissent identifies any material discrepancies in the record evidence concerning defendant's Airbnb income. While, as noted by the dissent, defendant made an argument before the motion court concerning her alleged expenses and labor in accommodating her subtenants, we have no occasion to address this argument because plaintiff has abandoned it on appeal.

**3.** As is evident from the foregoing discussion, we acknowledge that defendant was permitted to charge otherwise lawful subtenants a 10% premium over her own rent. Accordingly, contrary to the dissent's assertion, it is not "misleading" for us to point out that, based on her undisputed aggregate Airbnb income and her undisputed per diem rent, defendant realized a 72% aggregate profit, which, as noted, was about seven times the permissible 10% premium. In fact, it is a considerable understatement to quantify defendant's gross profit at 72%, and the aggregate overcharge of her subtenants at 56%, given that, as noted, the subtenants did not have sole possession of the apartment but, rather, shared it with defendant. Indeed, defendant refers to her subtenants as "roommates" throughout her appellate briefs, and states in her affidavit: "I always lived together with my roommates. Everything was shared. We even watched TV together." Based on these sworn admissions, it would appear that the lawful charge to the subtenants would have been based on half of defendant's rent, not the full rent. The dissent offers no rationale for its apparent view that it might be permissible for a rent-stabilized tenant to shift the entire rent to a subtenant who does not have sole possession of the entire apartment. Although, as more fully discussed below, defendant's "guests" were not roommates, we note that a rent-stabilized tenant may not lawfully charge a roommate more than the roommate's "proportionate share of the legal regulated rent" (RSC § 2525.7 [b]).

transient, short-term, paying guests she hosted over a year and a half were "roommates" within the purview of Real Property Law § 235-f and RSC § 2525.7. Contrary to the view of Supreme Court, the record establishes that defendant's "guests" were, as a matter of law, subtenants, and this matter is therefore governed by RSC § 2525.6 (*see Stavrolakes,* 33 AD3d at 491 [occupancy of a rent-controlled apartment "by numerous persons between 2001 and 2005—especially short-term transient students at illegal rents—was in the nature of subletting rather than taking in roommates"]). Accordingly, defendant's first and fourth affirmative defenses, both based on her claim that her guests were "roommates," are unavailing.

As her third affirmative defense, defendant alleges that plaintiff is not entitled to relief because her subletting was "de minimis[,] short term and insubstantial," a contention that she has repeated in her motion papers and on this appeal. In this regard, defendant asserts in her appellate brief that her subletting was "insubstantial when viewed in the context of a forty (40) year tenancy." The dissent takes the position that defendant has raised a triable issue as to whether the subletting was of substantial duration. The implication of this analysis, in which whether the unlawful conduct was of sufficient duration to be considered material is determined by comparison to the total length of the tenancy, has the effect of rendering lawful for a longstanding tenant the exact same conduct that would be unlawful for a tenant who has a shorter history in his or her apartment. The dissent offers no support for its assumption that the relevant legal provisions were enacted with an intent to discriminate in this fashion between tenants based on the lengths of their tenancies. In our view, subletting of an apartment at an excessive rental rate for 338 days over a year and a half, or for 11 out of 18 months, has taken place on a sustained basis, not intermittently, and for a substantial period of time, and thus constitutes unlawful profiteering, regardless of the duration of the tenancy before the unlawful conduct began. Indeed, the Appellate Term recently affirmed the eviction of a tenant who had sublet her rent-stabilized apartment through Airbnb for "at least 120 nights in a 14 month period" (*Steele,* 2016 NY Slip Op 51689[U], *1)—less than half the number of nights defendant sublet her apartment, over a roughly comparable period of time (*see also Continental Towers,* 128 Misc 2d at 681 [the tenant was evicted for having entered into an arrangement to sublet his apartment at an excessive rate for six months, although the subtenant appar-

ently vacated the premises before the term of the sublease had expired]).[4]

Defendant also argues that her profiteering was "insubstantial" because her Airbnb income did not exceed her legal regulated rent plus 10% during several months of the subletting. We find the point unavailing. Defendant sublet her apartment on a daily basis and, perforce, she had less Airbnb revenue in months during which her apartment was sublet for fewer days. To determine defendant's profit from the subletting, her income from the subletting should be compared to the share of her rent attributable to the days she was actually hosting a subtenant in the apartment, not to her rent for the entire month during which the subletting occurred.

Although she has not pleaded this as an affirmative defense, and barely touches on the point in her appellate briefs, defendant also appears to contend that plaintiff had knowledge of, and gave consent to, her subletting. Here again, the dissent is persuaded that there are issues to be determined at trial, including (1) "whether defendant acted with the knowledge of Samson [Management LLC], her landlord's agent," (2) "whether defendant obtained the consent of the building's managing agent," and (3) "whether the managing agent [of the building] had apparent authority to act for plaintiff." However, as more fully explained below, the record contains no admissible evidence that Samson, plaintiff's agent, ever knew of defendant's subletting before it was advised of the practice in the summer of 2012—more than a year after the subletting began—by the cooperative corporation's managing agent (which threatened to terminate plaintiff's proprietary lease if the subletting continued). Nor does any admissible evidence give rise to a triable issue as to whether defendant's alleged notice of her subletting to the cooperative corporation's managing agent was "binding" upon plaintiff.

Defendant's claim that plaintiff had notice of the subletting is based entirely on her contention that, before she listed the

4. In cases in which tenants found to have engaged in unlawful for-profit subletting have avoided eviction, the unlawful conduct has generally been of objectively brief duration. In *Cambridge Dev., LLC v Staysna* (68 AD3d 614 [1st Dept 2009]), the overcharging of the sole subtenant ceased "before the first month of the sublease had ended" (*id.* at 615). In *Ariel Assoc. v Brown* (271 AD2d 369 [1st Dept 2000], *lv dismissed* 95 NY2d 844 [2000]), as revealed by the record and appellate briefs, the apartment was sublet for only approximately one month during each of three summers, spread over four years. Similarly inapposite is the Appellate Term case of *Central Park W. Realty v Stocker* (1 Misc 3d 137[A], 2004 NY Slip Op 50058[U] [App Term, 1st Dept 2004]), in which the unlawful sublet lasted only one month.

apartment with Airbnb, she told an unidentified employee of the cooperative's building manager about the plan, who told her that it would not be a problem as long as she provided the building staff with a completed visitor notification form for each guest.[5] However, any notice defendant provided to the building manager, an agent of the cooperative corporation, is a complete red herring, because her landlord—plaintiff in this action—was not the cooperative corporation but the holder of the proprietary lease for her apartment and the owner of the shares in the cooperative corporation appurtenant to that unit. Neither defendant nor the dissent identifies any admissible evidence that could support an inference that the cooperative corporation's building manager had actual or apparent authority to act for plaintiff or that the building manager (assuming that, as defendant claims, she. gave the building manager advance notice of her plan to receive guests through Airbnb) notified plaintiff of the subletting at any time before an attorney for the cooperative corporation sent plaintiff a letter, in June 2012, demanding that the subletting be brought to a halt.

In assessing defendant's claims that plaintiff somehow had notice of her subletting, it is critical to bear in mind that the record establishes that plaintiff and the cooperative corporation were represented by different property management companies. As previously noted, plaintiff's agent was Samson, the company that signed defendant's renewal lease and sent her correspondence concerning the apartment, and to which defendant made her rent checks payable.[6] The agent for the cooperative corporation, on the other hand, apparently was a

---

**5.** Defendant states in her affidavit: "Because I was concerned that the building might not allow my roommates entry to my apartment, I actually spoke to the property manager of the building and explained the situation *before* starting the whole AIRBNB roommate process. I was told specifically by building management that it would *not* be a problem and that so long as I completed the building's Visitor Notification Form each time I had a new roommate or guest, there would be *no* issue. My building has a doorman, and, as requested by management, I notified management of my roommates/ guests, as evidenced by Plaintiff's exhibit 'F' [copies of several visitor notification forms that defendant filled out]."Notably, defendant does not claim to have told the building's management that she would be charging her "roommates" unlawfully excessive rent (or, indeed, that she would be charging them anything at all), or that the anticipated "roommates" would be people unknown to her who had responded to an online advertisement. If defendant actually disclosed these facts to the managing agent, it is strange that she did not forthrightly say so in her affidavit or in her deposition testimony.

**6.** Plaintiff, as a trust, rather than a natural person, necessarily acts through agents. At all times during the period of defendant's subletting, plaintiff's trustee was Arnold Goldstein, an executive of Samson, who died during the pendency of this action. It is not clear what the dissent means by

company known as Lawrence Properties, as evidenced on a Department of Housing Preservation and Development building registration summary report for 39 Fifth Avenue, dated January 22, 2015, which is part of the record. In addition, Barbara Schmidt, the person listed as the building's managing agent on the visitor advice notification forms that defendant completed for her guests, is identified as an affiliate of Lawrence Properties in the June 2012 letter from the cooperative's counsel to plaintiff demanding the cessation of defendant's subletting.[7] Again, the record is utterly bereft of any basis for treating notice to the cooperative's managing agent as notice to plaintiff, or for deeming the acts of the cooperative's managing agent to have been authorized by, or binding upon, plaintiff.

While defendant testified at her deposition that "Sampson [sic] Management [plaintiff's agent] knew" about her subletting, this statement by defendant, about the state of mind of a person or persons other than herself, has no foundation whatsoever and therefore does not constitute admissible evidence. Defendant did not testify at her deposition, nor did she state in her affidavit, that she ever notified any employee of Samson, either in writing or orally, of her Airbnb subletting. When asked at her deposition how she believed that Samson came to know of the subletting, defendant referred to the visitor advice notification forms that she had supplied to the building staff. There is no evidence in the record, however, that these forms were transmitted to Samson.[8] Defendant, having failed to notify plaintiff's agent of her plan to book paying guests through

---

its assertion that "[t]here is no evidence that defendant ever had any direct communication with an individual representing plaintiff during the four decades of her tenancy." In addition to numerous rent checks defendant made payable to Samson, the record contains several renewal leases and other documents relating to the tenancy signed by defendant and, on behalf of Samson, by a person apparently named Estelle Magidson. The record also contains a letter handwritten by defendant and addressed to "Deslin Neal" at Samson, in which defendant refers to her 2009 lease as "my most current lease."

7. Defendant testified at her deposition that Barbara Schmidt "banged" on her door in July or August of 2012 and told defendant that she was going to be "throw[n] . . . out" of her apartment. Defendant's account of Schmidt's anger over the subletting is inconsistent with defendant's position that she had gotten the approval of the building's managing agent for the subletting before she listed the apartment on Airbnb.

8. The dissent does not explain how defendant's unfounded testimony (as summarized by the dissent) that "plaintiff knew about her roommates from the visitor logs she completed and gave to the building staff" could possibly constitute admissible evidence, given that, as noted, there is neither any evidence that these forms or the information they contained were transmitted

Airbnb, cannot use her own unfounded speculation to create a triable issue as to what plaintiff's agent knew about her use of the apartment. Further, there is no evidence that plaintiff had given her any reason to believe that employees of the building's managing agent were also plaintiff's agents.[9]

Contrary to the dissent's view, there is no issue as to whether defendant "has cured or can cure." The decisions of this Court and the Second Department cited in the first paragraph of our discussion establish that, once substantial profiteering has been established, the tenant is subject to eviction without any right to cure, as a matter of law (*see also Steele*, 2016 NY Slip Op 51689[U], *1; *Ikezi*, 2015 NY Slip Op 50124[U], *6; *Brookford*, 47 Misc 3d at 743-745; *30-40 Assoc. Corp. v Cuervo*, 16 Misc 3d 127[A], 2007 NY Slip Op 51232[U] [App Term, 1st Dept 2007]). As the Appellate Term stated in *Continental Towers*, "The integrity of the rent stabilization scheme is obviously undermined if tenants, who themselves are the beneficiaries of regulated rentals, are free to sublease their apartments at market levels and thereby collect the profits which are denied the main landlord. . . . The tenant was commercializing with the apartment in a manner which defrauded his landlord as well as his subtenant. This practice, which the Rent Stabilization Law was designed to prevent, is not to be condoned by

to plaintiff's agent (Samson) nor any evidence that members of the building staff were plaintiff's agents. In any event, the visitor advice notification forms did not disclose that defendant was engaged in subletting at an unlawful rental rate.

**9.** There is no basis for the dissent's assertion that a triable issue exists as to whether the building's managing agent had actual or apparent authority to act for plaintiff. To begin, there is no evidence in the record that the building's managing agent had actual authority to act as plaintiff's agent. In this regard, the dissent points to no basis for its speculation that Barbara Schmidt, the representative of the building's managing agent, was acting for plaintiff when she told defendant in the summer of 2012 that defendant had placed herself at risk of eviction. As is evident from the cooperative corporation's aforementioned June 2012 letter to plaintiff demanding that there be no "future illegal subletting of the Unit," the cooperative corporation had an independent interest in the cessation of defendant's Airbnb subletting, which was contrary to the interests of the building's other permanent residents. As to apparent authority, the applicability of that doctrine "depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal—not the agent" (*Indosuez Intl. Fin. v National Reserve Bank*, 98 NY2d 238, 245-246 [2002] [internal quotation marks omitted]). The record is devoid of evidence of any conduct by plaintiff (through its actual agent, Samson) by which defendant reasonably could have been misled to believe that the building's managing agent had authority to act for plaintiff. In the absence of such evidence, no triable issue as to apparent authority arises (*see N.X. v Cabrini Med. Ctr.*, 97 NY2d 247, 252 n 3 [2002]).

permitting the tenant to remain after the fraud has been found out" (128 Misc 2d at 681-682 [footnotes omitted]). Accordingly, defendant is not entitled to an opportunity to cure her breach, nor was she entitled to a notice to cure, and her second affirmative defense, based on plaintiff's failure to serve a notice to cure, should be dismissed.

While there are cases in which tenants who have overcharged their subtenants have nevertheless been permitted to cure, in such cases, as previously noted, the illegal subletting generally has been of short duration (*see e.g. Cambridge*, 68 AD3d at 615 [the illegal overcharging of the subtenant lasted less than one month]). Moreover, in this context, "cure" does not mean simply the termination of the illegal subletting, but also the refund to the subtenants of the overcharges (*see id.; Ariel Assoc. v Brown*, 271 AD2d at 370 [affirming denial of eviction where the tenant "promptly refunded all sums to the subtenants"]; *Cuervo*, 2007 NY Slip Op 51232[U], \*1 [affirming eviction where, inter alia, the tenant "failed to refund the overcharge"]; *Central Park W. Realty v Stocker*, 1 Misc 3d 137[A], 2004 NY Slip Op 50058[U], \*2 [affirming denial of eviction based on a one-month sublet where, inter alia, "tenant refunded the overcharge to the subtenant"]). In this case, not only does defendant not allege that she has cured by refunding the overcharges to any of her 93 former subtenants, she has never offered, either before the motion court or upon this appeal, to refund the overcharges to the subtenants.[10] This is not surprising. Given that defendant hosted 93 different subtenants, with whom she had no direct financial dealings, it appears that the overcharges that defendant collected could not practicably be refunded.

Defendant's remaining affirmative defenses are without merit. The fifth affirmative defense should be dismissed in the absence of any showing that the action is time-barred. The sixth affirmative defense, lack of standing, should be dismissed because, plaintiff established, via its proprietary lease and share certificate evidencing its ownership of the shares appurtenant to the apartment, that it was the landlord. Contrary to the seventh affirmative defense, declaratory relief is appropriate in a landlord-tenant action (*see e.g. Eckstein v New York Univ.*, 270 AD2d 208 [1st Dept 2000], *lv denied* 95 NY2d 760 [2000]). Finally, the eighth affirmative defense and first counterclaim, which seeks attorneys' fees under the reciprocal

---

10. Unlike the dissent, we see no issue as to whether defendant has cured, or could cure, by refunding the overcharges, given that defendant, as noted, has neither claimed to have refunded any of her subtenants in the past nor indicated any readiness to refund those subtenants in the future.

provision of Real Property Law § 234, should be dismissed because, in view of the foregoing, there is no possibility of a result substantially favorable to defendant (*see e.g. Walentas v Johnes*, 257 AD2d 352 [1st Dept 1999], *lv dismissed* 93 NY2d 958 [1999]).

In considering this appeal, we are mindful of the fact that defendant's age and health status naturally evoke sympathy. We also acknowledge that the forfeiture of a rent-stabilized leasehold is no small loss, especially after a tenancy that has lasted for more than 40 years. On this record, however, it is simply undeniable that—as defendant herself essentially admits—she exploited the governmentally-conferred privilege of her rent-stabilized tenancy to take financial profits unavailable to her landlord, well in excess of the permissible 10% premium for a furnished apartment. Moreover, defendant's exploitation of her rent-stabilized leasehold disregarded, not only the rights of her landlord, but also the rights of all of her fellow permanent residents of the building, whether shareholders or lessees. The other residents did not bargain to share the building where they made their homes with a continuous stream of transient strangers (to defendant no less than to themselves) of unknown character and reputation, drawn to the building from all over the world by Internet advertising (*see Steele*, 2016 NY Slip Op 51689[U], *2 ["tenant's illegal, de facto hotel operation (through Airbnb) showed complete disregard for the legitimate security concerns of landlord and other tenants, as she . . . brought dozens of strangers into a residential building"]). Seen in this light, defendant's systematic commercial exploitation of her rent-stabilized leasehold fully warrants the termination of her lease. Accordingly, we modify to grant plaintiff summary judgment. Concur—Tom, J.P., Friedman and Kapnick, JJ.

Richter and Gesmer, JJ., dissent in a memorandum by Gesmer, J., as follows: In my view, the motion court correctly found that there are material issues of fact that precluded it from granting summary judgment as to plaintiff's complaint, which seeks to evict defendant for unlawfully subletting her rent stabilized apartment, and as to defendant's second affirmative defense, that plaintiff failed to serve a notice to cure, and her third affirmative defense, that her conduct did not rise to the level of profiteering which would justify her eviction from her long-time home.[1] It has long been the rule that the court's task on a motion for summary judgment is "[i]ssue-

---

1. I concur with the majority that defendant's rental of her rent-stabilized apartment to guests for brief stays does not constitute a roommate situation

finding, rather than issue-determination" (*Sillman v Twentieth Century-Fox Film Corp.*, 3 NY2d 395, 404 [1957] [internal quotation marks omitted]). Therefore, to defeat a summary judgment motion, defendant need only raise triable issues of fact requiring a trial (CPLR 3212 [b]), which I would find she has done.

Plaintiff is the owner and proprietary lessee of an apartment in a building owned by a cooperative corporation, 39 Fifth Avenue Owners Corporation (39 Fifth). Samson Management LLC (Samson) is plaintiff's current managing agent for the apartment.

Defendant, now 69, has lived in the apartment since 1973 pursuant to a rent stabilized lease. The lease required a tenant wishing to sublet to obtain the landlord's consent, which shall not be unreasonably withheld. The lease further provides that, where the tenant defaults on this or other lease obligations, the landlord shall serve a notice to cure on the tenant as a predicate to a notice to terminate and eviction proceedings. There is no evidence in the record that defendant ever had a roommate or defaulted on her lease obligations in any way in the 38 years of her tenancy before the events at issue here.

In 2010, defendant was diagnosed with cancer, and, upon disclosing that to her employer, was terminated from her job. After that, she was not able to find another job, and received unemployment insurance. She then underwent six operations, and was unable to work for more than a year. As her financial situation worsened, she realized that, in order to pay her rent, she needed to find a roommate, but she found it difficult to do so.

A friend suggested that she look for a roommate through Airbnb. Concerned that the building might not approve this arrangement, defendant spoke with the building's property manager who told her that it would "not be a problem" as long as she completed and returned to management the building's Visitor Advice Notification Form each time she had a guest. The property manager did not tell her to obtain permission from anyone else. The building's superintendent gave defendant a stack of the forms. The form was headed "39 Fifth Ave. Owners Corp." and stated at the bottom, "If you have any questions, please contact Barbara Schmidt, Managing Agent . . . or Mike Blakaj, Superintendent." Defendant claims that she would not have used Airbnb if the property manager had

(*see 220 W. 93rd St., LLC v Stavrolakes*, 33 AD3d 491 [1st Dept 2006], *lv denied* 8 NY3d 813 [2007]), and that her "guests" were subtenants under the Rent Stabilization Code (*see* 9 NYCRR 2525.6).

objected to her doing so. Plaintiff does not dispute that defendant sought and obtained the approval of the property manager.

Defendant then listed the apartment on Airbnb in or about February 2011. The online listing set the cost at $95 per night for single persons and $120 per night for couples. Airbnb received a 3% commission on the sums charged. Each guest was screened by Airbnb, which provided a brief biography of each guest to defendant. Defendant reviewed each guest's biography, and communicated with each potential guest by email before arranging for the guest to stay with her. Defendant continued to use the apartment as her primary residence, and cooked meals for each guest. Each guest shared the entire apartment with her, including the one bathroom and unlimited use of the kitchen. They even watched TV together. Defendant completed the Visitor Advice Notification Form for each guest and gave it to management to notify them of each guest, which plaintiff does not dispute. Defendant testified at her deposition to her belief that Samson was also aware that she had people staying with her from the forms that she completed.

On or about June 12, 2012, the building's counsel advised plaintiff that defendant had been "illegally sub-subletting the Unit for short-term rentals." The building served plaintiff with a notice to cure on or about August 29, 2012.

In late July or early August 2012, Barbara Schmidt, who is listed on the Visitor Advice Notification Form as 39 Fifth's managing agent, went to defendant's apartment, banged on her door, and told defendant that she was going to have her evicted. Ms. Schmidt was accompanied by the building's superintendent. Defendant immediately consulted counsel and, promptly thereafter, on or about August 24, 2012, defendant terminated her account at Airbnb.

A rent stabilized tenant is permitted to charge an authorized subtenant 10% above the legal rent if the apartment is rented furnished (9 NYCRR 2525.6 [e]). The primary tenant may also charge a subtenant for expenses such as utility payments (*see Cambridge Dev., LLC v Staysna*, 68 AD3d 614, 615 [1st Dept 2009] [primary tenant permitted to cure overcharge of subtenant by applying excess to utility payments and future rent]).[2] During the relevant period, defendant's monthly rent was $1,758.01. Defendant's monthly income from Airbnb exceeded

---

2. While the record shows that defendant incurred expenses for utilities, household supplies and groceries, and that she argued before the motion court that the sums charged were also intended to pay for her labor in cooking and cleaning for guests, she did not make these arguments on appeal, and, therefore, they are not properly before us.

$1,933.81 (her legal rent plus 10%) during only eight months: from June through December 2011, and in August 2012. Looked at another way, defendant's per diem charge of $95 per night for single guests or $120 per night for couples exceeded her rent plus 10% on a per diem basis ($1,933.81/30 = $64.46) by approximately $30 per night for single guests or $55 per night for a couple. The majority's claim that defendant realized a 72% profit over 18 months is misleading for two reasons. First, those calculations are based on the amount she received above her legal rent, rather than in excess of her rent plus 10%. Second, plaintiff's and defendant's charts of the sums received by defendant differ in some respects. It is not clear whether each chart applies sums received to the month in which defendant received them or the month in which each guest stayed in defendant's home. Accordingly, I would find that the amount of profit defendant may have realized is a question of fact precluding summary judgment.

It is undisputed that plaintiff never served a notice to cure on defendant. On or about October 4, 2012, plaintiff served defendant with a notice of termination.

The Rent Stabilization Code requires a landlord's consent to sublet (9 NYCRR 2525.6 [e]), and prohibits a tenant from charging a subtenant more than the legal rent plus a 10% surcharge if the premises is fully furnished (9 NYCRR 2525.6 [b]). Where a tenant violates these provisions, the landlord may terminate the tenancy (9 NYCRR 2525.6 [f]). Where a holdover proceeding is based on a claim that the tenant has defaulted under the subleasing provisions of the lease, in addition to any right to cure provided in the lease itself, the tenant is entitled to a 10-day stay of the warrant of eviction in order to cure the default (RPAPL 753 [4]).

However, where the tenant's conduct rises to the level of profiteering, courts have found such conduct not subject to cure, since "[t]he integrity of the rent stabilization scheme is obviously undermined if tenants, who themselves are the beneficiaries of regulated rentals, are free to sublease their apartments at market levels and thereby collect the profits which are denied the main landlord" (*Continental Towers Ltd. Partnership v Freuman*, 128 Misc 2d 680, 681 [App Term, 1st Dept 1985]). There is no consistent legal definition of the term "profiteering" in this context. Since tenants who overcharge subtenants are sometimes permitted to cure, "profiteering" does not mean just making a profit. Rather, as the dictionary definition of the term implies, profiteering involves making an "excessive" profit (Oxford English Dictionary [2017], profiteer-

ing). Cases in which a rent stabilized tenant is evicted for unlawful profiteering generally involve tenants who charge two or more times the legal regulated rent[3] (*Continental Towers* at 681; *see also 42nd & 10th Assoc. LLC v Ikezi*, 46 Misc 3d 1219[A], 2015 NY Slip Op 50124[U] [Civ Ct, NY County 2015], *affd* 50 Misc 3d 130[A], 2015 NY Slip Op 51915[U] [App Term, 1st Dept 2015]; *30-40 Assoc. Corp. v Cuervo*, 16 Misc 3d 127[A], 2007 NY Slip Op 51232[U] [App Term, 1st Dept 2007]; *West 148 LLC v Yonke*, 11 Misc 3d 40 [App Term, 1st Dept 2006], *lv denied* 2006 NY Slip Op 73839[U] [1st Dept 2006]), and whose conduct offends their rent stabilized lease in other ways as well, such as inducing the landlord's consent by lying about the rent to be charged (*Continental Towers*, 128 Misc 2d at 681), using the premises from the inception of the lease as a "hotel" and rarely, if ever, as a primary residence for the primary tenant's own use (*42nd & 10th Assoc.*, 2015 NY Slip Op 50124[U]), or having business cards printed up listing the premises as a "bed and breakfast" (*West 148 LLC*, 11 Misc 3d at 41).

Conversely, a rent stabilized tenant who overcharges a subtenant is not subject to eviction where her conduct does not rise to the level of profiteering and she has cured (*Cambridge Dev.*, 68 AD3d at 615; *Ariel Assoc. v Brown*, 271 AD2d 369 [1st Dept 2000], *lv dismissed* 95 NY2d 844 [2000]; *Central Park W. Realty v Stocker*, 1 Misc 3d 137[A], 2004 NY Slip Op 50058[U] [App Term, 1st Dept 2004]). Courts have so held even where the tenant did not obtain the landlord's consent prior to subletting (*672 Ninth Ave. LLC v Burbach*, 14 Misc 3d 1236[A], 2007 NY Slip Op 50321[U] [Civ Ct, NY County 2007]; *2328 UNIAVE Corp. v Beheler*, 2003 NY Slip Op 51135[U] [Civ Ct, Bronx County 2003]). Such cases usually involve long-term tenants whose sublease period was short relative to the length of their tenancy (*Cambridge Dev., LLC*, 68 AD3d at 615 [16-year tenant sublet for five months]; *Ariel Assoc. v Brown*, 271 AD2d at 370 [20-year tenant sublet for three summers over four years];[4] *Central Park West Realty, LLC*, 2004 NY Slip Op 50058[U] ["long term" tenant sublet for one month]; *672 Ninth Ave. LLC*, 2007 NY Slip Op 50321[U] [14-year tenant sublet for 21 months]). In such cases, courts have exercised their discretion

---

**3.** The only authority cited by the majority for its statement that the defendant may only charge her guests for their proportional share of the rent relates solely to roommates and is not applicable here.

**4.** The Appellate Division opinion refers to "summer subletting," but the trial court opinion found that the tenant sublet for three summers over four years (*Ariel Assoc. v Brown*, NYLJ, Sept. 18, 1997 at 4, col 6 [App Term 1st Dept 1997]).

to permanently stay the warrant of eviction. Whether the trial court should do so depends on the totality of the factual circumstances of each case, including the length of the tenancy, the tenant's conduct prior to the default complained of, and the circumstances and severity of the default (*see 326-330 E. 35th St. Assoc. v Sofizade*, 191 Misc 2d 329 [App Term, 1st Dept 2002]). These cases create a test which, applied to this case, I would find precludes the grant of summary judgment.

Because of the fact specific nature of this inquiry, allegations that a tenant engaged in rent profiteering should generally be decided at a plenary trial, and not on summary judgment (*13775 Realty, LLC v Foglino*, 51 Misc 3d 126[A], 2016 NY Slip Op 50335[U] [App Term, 1st Dept 2016]; *335-7 LLC v Steele*, 43 Misc 3d 144[A], 2014 NY Slip Op 50891[U] [App Term, 1st Dept 2014]). Here, I would find that there is a question of fact as to whether defendant engaged in profiteering, or rather used Airbnb to enable herself to continue to live in her long time home, which would not be inconsistent with the purposes of the Rent Stabilization Law.[5] Moreover, it is clear on this record that defendant engaged in the practice of subletting for a short time (338 days over 18 months) relative to the length of her tenancy (43 years). There is other evidence in the record as well that demonstrates that she did not turn her apartment into a commercial enterprise, including that she asked permission from the managing agent before establishing her Airbnb account, reviewed the biographies of each guest and communicated with each before permitting them to stay in her apartment, resided in the apartment with each of her guests, gave management notice of each guest, and terminated her Airbnb account upon learning that there was any objection to her conduct and before being served with the notice of termination.[6] In my view, the majority's insistence that defendant's actions in this case constitute profiteering "as a matter of law" fails to take full account of the case law in this area, and the ways in which the facts of this case, as alleged by defendant, differ in significant respects from the facts in cases where profiteering was found.

Therefore, I would find that defendant has raised at least the following factual issues precluding summary judgment: (1) whether defendant overcharged her subtenants, and, if so, in

---

5. Among the purposes of the Rent Stabilization Law is to prevent the "uprooting [of] long-time city residents from their communities" (Administrative Code of City of NY § 26-501).

6. I do not concede, as the majority claims, that defendant's conduct created a "single-unit tourist hotel."

what amounts; (2) whether defendant acted with the knowledge of Samson, her landlord's agent, as defendant testified at her deposition; (3) whether defendant obtained the consent of the building's managing agent; (4) whether the managing agent had apparent authority to act for plaintiff;[7] (5) whether defendant's conduct rises to the level of profiteering requiring termination of her 43-year tenancy; and (6) if it does not, whether defendant has cured or can cure, including by refunding the amount of any overcharge to subtenants found to have been overcharged.[8] Accordingly, I would find that the motion court appropriately denied summary judgment as to plaintiff's complaint and defendant's second and third affirmative defenses.

---

**7.** The majority urges that the landlord was not aware of defendant's actions. I view this as yet another factual question precluding summary judgment. Defendant testified at her deposition that plaintiff knew about her roommates from the visitor logs that she completed and gave to the building staff. I would further find that there is also a question of fact as to whether defendant obtained consent from the building's managing agent, as defendant also testified she did, and, if so, whether the managing agent had actual or apparent authority to bind the landlord. There is no evidence that defendant ever had any direct communication with an individual representing plaintiff in the four decades of her tenancy. The only evidence of defendant's dealings with plaintiff's managing agent are the managing agent's signature on her renewal leases, her rent checks sent to the managing agent, and three pieces of correspondence about rent and a renewal lease between 2003 and 2012. Furthermore, it was Barbara Schmidt, the managing agent for 39 Fifth, not plaintiff, who first advised defendant that she was at risk of eviction, suggesting that building staff, at least on some occasions, behaved as if it were an intermediary between defendant and plaintiff. In any event, as discussed above, a tenant who sublets without consent of the landlord is not necessarily subject to eviction on this basis.

**8.** I disagree with my colleagues in the majority that any overcharges collected "could not practicably be refunded," since there is no basis in the record for such a finding.